IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SANDEEP "SONNY" BHARADIA, | |
| Plaintiff, | |
| vs. | Case No: _____ |
| TOWN of THUNDERBOLT, GEORGIA; HENRY M. "TREY" CONNERS, III, in his Individual Capacity; and SAMUEL K. O'DWYER, in his Individual Capacity, | **COMPLAINT** **(Jury Trial Demanded)** |
| Defendants. | |

Plaintiff Sandeep "Sonny" Bharadia (hereafter "Sonny" or "Plaintiff"), by and through undersigned counsel, complains of Defendants Town of Thunderbolt, Georgia, Henry M. "Trey" Conners, and Samuel K. O'Dwyer (hereafter "Defendants") as follows:

## INTRODUCTION

1.      Sandeep "Sonny" Bharadia spent 23 years in jail and prison for crimes he did not commit. He was falsely and maliciously labeled a "terrorist" in the immediate aftermath of the events of September 11, 2001, solely because he is non-White. He was wrongly accused and unjustly convicted of burglary, aggravated sodomy, and aggravated sexual battery.

2.     The subject crimes occurred in Thunderbolt, Georgia, a community on the outskirts of Savannah. On Sunday, November 18, 2001, a young woman ("JF")[1] returned home to find a man burglarizing her apartment. Over the next two hours, the man held JF hostage while subjecting her to a series of sexual assaults. The next day, JF's parents reported the assault to Chief of Police Samuel O'Dwyer and Detective "Trey" Conners of the Thunderbolt Police Department ("Thunderbolt PD" or "TPD").

3.     All clues pointed to a career criminal by the name of Sterling Flint as the perpetrator.

- Items stolen from JF's residence were found amidst Flint's belongings at the home of Flint's girlfriend.

- Flint had parked a stolen U-Haul trailer in front of the home of his girlfriend's sister, who lived just around the corner from JF's apartment in Thunderbolt.

- Flint was a career criminal with a documented history of daytime burglaries, use of tire tools to force entry into homes, and use of a U-Haul to store items he had stolen – all characteristics that were evident with the JF home invasion.

- Flint had longstanding ties to the Savannah area. He had lived there, attended Savannah State University, and his girlfriend lived there. He also had prior connections to Thunderbolt and familiarity with JF's apartment complex.

- Flint had a pair of blue and white batting gloves which matched the description provided by JF. Flint's gloves were found amidst his belongings and items stolen from JF's apartment.

---

[1]    In an effort to protect the victim's privacy, her initials, JF, will be used throughout this Complaint in place of her full name.

4.    Sonny's name surfaced during the investigation of the JF assault only because he'd had brief dealings with Flint *the day after Flint committed these crimes*. On Monday, November 19, 2001 – the day *after* Flint's assault of JF – Sonny drove down from Atlanta to pick up his 1999 Chevy Tahoe that had been at the impound lot of the Beaufort County (SC) Sheriff's Department over the weekend of November 17-18, 2001. Sonny enlisted Flint's help in returning the Tahoe to Atlanta, but Flint stole it on the drive back.

5.    When Sonny reported the theft of his Tahoe to law enforcement, he also told them that Flint kept a stolen motorcycle at his girlfriend's (Ashleigh Dold) home. This information was conveyed to Detective Conners and Thunderbolt PD by Savannah PD, and was based on Sonny's report that Flint kept a stolen motorcycle at Dold's home.

6.    During the ensuing investigation at Dold's home, Conners found JF's stolen property amidst Flint's personal belongings and Flint's batting gloves that matched JF's description of the gloves worn by her attacker.

7.    Based on Dold's statements and the evidence found in her home, Conners correctly identified Flint as a likely suspect. That same day, Conners had JF view a photo array including Flint and five other Black males. Unsurprisingly, JF picked Flint as her assailant. JF, however, also identified another Black male as resembling her attacker. Because JF picked two persons, Conners knew that the photo array would be of limited evidentiary value.

3

8.     Rather than attempting to bolster the case against the actual perpetrator, Conners decided to shift gears and manufacture a case against Sonny. Conners was motivated both by a desire to close the case quickly, as he was actively pursuing a job with Savannah PD, and his strong anti-Muslim bias.[2] Additionally, Conners had received minimal training as an investigator, was not qualified to serve as a detective, and received inadequate supervision from Chief O'Dwyer.

9.     No evidence linked Sonny to the crimes committed against JF. From the outset, Sonny truthfully proclaimed his innocence and explained that he was hundreds of miles away – in Atlanta – at the time of the crimes of which he was wrongly accused. Dold was clear that **Sonny arrived in Savannah on Monday, November 19, 2001**. Readily available evidence demonstrated that Sonny was in Atlanta during the entire weekend of November 17-18, 2001.

10.     Because no evidence existed to link Sonny to the assault and burglary of JF, Conners fabricated evidence against him. On November 29, 2001 – the day after JF identified Flint as the perpetrator – Conners orchestrated a sham photo array specifically designed to cause JF to incorrectly identify Sonny as her assailant. Sonny's trial counsel, Caleb Banks, would later testify that he and Chief O'Dwyer laughed about the absurdity of the photo array in which Sonny was featured.

---

[2]   Sonny Bharadia is of Indian descent and a devout Christian. Throughout the trial court proceedings, Conners displayed a strong personal animus against Sonny and baselessly labeled him an "Islamic terrorist." That charge carried significant emotive weight in late 2001, just several weeks removed from the 9/11 attacks.

11.     Armed with a manufactured identification of Sonny as the perpetrator, Conners had Sonny arrested on November 30, 2001. Sonny remained incarcerated until his release on November 22, 2024. Conners fabricated the case against Sonny despite all credible evidence pointing to Sonny's innocence and Flint's guilt due to a combination of his lack of competence, tunnel vision, a reckless rush to close the case, and animus towards Sonny and persons who "looked to be Muslim." Absent Conners's fabrication of evidence in the form of a bogus witness identification and his lies about Dold's statement, no arrest warrant would have been issued.

12.     Sonny's case was called for trial on June 26, 2003. Trial proceeded as Conners intended. The key witnesses were Conners and Flint. The prosecutor, not knowing that JF's misidentification of Sonny had been orchestrated by Conners, had JF testify about the events of November 18, 2001, and her (mistaken) belief that Sonny was the man who was in her apartment that day.[3]

13.     To ensure the success of the sham identification, Conners and Chief O'Dwyer did not provide any photo arrays to the Chatham County District Attorney's Office ("DA's Office") and caused their permanent loss or destruction.[4]

_____

[3]  After Conners arrested Sonny, *SavannahNow* ran a story about the case and used the same photo of Sonny that Conners had prominently displayed in the photo array in which JF purportedly picked Sonny. As discussed below, the case bears numerous hallmarks of a mistaken identification. JF saw the *SavannahNow* article and the same photo of Sonny that Conners had used in the photo array, a fact which would serve to reinforce her mistaken belief that she had identified the right person as her assailant.

[4]  Though both photo arrays were missing through the time of Sonny's trial, the Flint photo array was obtained, in 2012, during post-conviction proceedings. The more critical array – the unduly suggestive one in which Sonny was so prominently featured – has never been located. It is thus

14.    Sonny was convicted of aggravated sodomy, aggravated sexual assault, and burglary. He was sentenced to life in prison without parole.

15.    The evidence used to procure Sonny's arrest, seizure, and wrongful conviction was fabricated. Materials which would have demonstrated Sonny's innocence (and Flint's culpability) were wrongfully concealed by Thunderbolt PD officers Conners and O'Dwyer. Additionally, Defendant Conners perjured himself at trial and also facilitated the false testimony of Flint. Because TPD officials, including O'Dwyer and Conners, destroyed or caused the permanent loss of critical documents, materials, and evidence, Sonny's trial counsel was prevented from demonstrating that Conners both offered and facilitated false testimony.

16.    In 2004, Touch DNA analysis, a new type of DNA testing that was unavailable before Sonny's trial, revealed the existence of male DNA on the batting gloves worn by JF's assailant *that did not match Sonny*. In 2012, the Georgia Bureau of Investigation ("GBI") determined that it was Flint's DNA on the batting gloves. Despite DNA evidence that proved Flint assaulted JF, it would take another 12 years to overturn Sonny's wrongful convictions.

17.    All the while, attorneys working on Sonny's behalf continued with efforts to uncover additional evidence and records for which the Town of Thunderbolt ("Town") and Thunderbolt PD should have been able to provide some

---

believed that Defendants O'Dwyer and Conners purposefully, and in bad faith, caused the destruction or permanent loss of that evidence.

account. Due to chronic deficiencies with their evidence maintenance system and a "nightmare" of a Property Room, the Town and Thunderbolt PD provided inconsistent, varying, and inaccurate reports regarding disposition of evidence and the location of relevant, properly requested documents and materials.[5]

18.     On April 9, 2024, Judge Laura Tate of Gwinnett County Superior Court vacated Sonny's convictions, concluding that Thunderbolt PD investigators employed and then destroyed an "impermissibly suggestive" identification procedure, "presented false evidence," and "suppressed material, exculpatory evidence." A Bond Order was issued, and Sonny was released from custody on November 22, 2024. Citing the DNA evidence, the DA's Office moved for an Order of Nolle Prosequi on May 16, 2025. That motion was immediately granted by Judge James Bass, Jr., Senior Judge of Chatham County Superior Court, and the criminal case against Sonny was dismissed.

19.     Falsely arrested on November 30, 2001, Sonny Bharadia remained incarcerated until November 22, 2024 – just one week short of 23 years in jail and prison as an innocent man. This civil rights action is intended to provide Mr. Bharadia some recompense for the immeasurable harms and injuries he suffered

---

[5]  Both Conners and O'Dwyer were stripped of their Georgia law enforcement certifications in the early 2000s. Though there were efforts to undertake some organization of the Thunderbolt PD Property Room after the departure of Conners and O'Dwyer, the attempts were sporadic and largely ineffectual. More critically, however, it appears that those officers destroyed key records and items of evidence during their tenures with Thunderbolt PD.

during a 23-year wrongful incarceration, as well as the continuing effects arising from that ordeal.

## JURISDICTION AND VENUE

20.    This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

21.    This Court has pendent jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

22.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims at issue in this matter occurred in this District.  Plaintiff also currently resides, and resided at the time of the crimes of which he was wrongly accused, in this District.

23.    On May 16, 2025, an Order of Nolle Prosequi was entered in Chatham County Superior Court, and Plaintiff was finally absolved of any responsibility for the crimes which led to his wrongful conviction. Plaintiff was removed from legal jeopardy with respect to same at that point. Accordingly, Plaintiff's civil rights claims, as alleged herein, accrued on May 16, 2025, and are thus timely filed. *See McDonough v. Smith*, 139 S. Ct. 2149 (2019); *Heck v. Humphrey*, 512 U.S. 477 (1994).

## PARTIES

24.     **Plaintiff Sandeep "Sonny" Bharadia** resides in Lilburn, Georgia, which is situated within the Northern District of Georgia.

25.     **Defendant Town of Thunderbolt, Georgia** is a municipal corporation organized under the laws of the State of Georgia. The Thunderbolt Police Department ("TPD") is, and was at all times pertinent to this action, a department of Defendant Town of Thunderbolt.

26.     **Defendant Henry M. "Trey" Conners** ("Conners") is, upon information and belief, a citizen and resident of Savannah, Georgia. At all relevant times, Conners was employed as a police officer, investigator, and evidence custodian with Thunderbolt PD and was acting under color of law and within the scope of his employment with the Town of Thunderbolt and TPD. Conners is sued in his individual capacity.

27.     **Defendant Samuel K. O'Dwyer** ("O'Dwyer") is, upon information and belief, a citizen and resident of Springfield, Georgia. At all relevant times, O'Dwyer was employed as the Chief of Police with Thunderbolt PD and was acting under color of state law and within the scope of his employment with the Town of Thunderbolt and TPD. O'Dwyer is sued in his individual capacity.

28.     At all relevant times, in committing the acts and omissions herein alleged, each of the named individual Defendants was acting within the scope of his employment and under color of state law.

## FACTS

**I.    SANDEEP "SONNY" BHARADIA IS UNLAWFULLY ARRESTED AND WRONGFULLY PROSECUTED FOR CRIMES HE DID NOT COMMIT.**

### Burglary and Assault of JF in Thunderbolt, Georgia

29.    On the afternoon of Sunday, November 18, 2001, JF returned to her apartment at the River Crossing Apartments, in Thunderbolt, Georgia, just outside of Savannah. JF resided in one of the downstairs units – Apartment D3. JF had attended church and returned to her apartment at about 12:30 p.m. that afternoon.

30.    Immediately upon entering her apartment, JF saw components of her computer stacked on a recliner. She then saw the man who was burglarizing her apartment. She observed that he was wearing a puffy red coat, jeans, and blue and white gloves. The man pushed JF into the bedroom and then into a closet.

31.    The assailant stripped JF naked and tied her to a chair in her closet, threatening her with a knife. The man covered JF's eyes with a ski hat so that she could not identify him.

32.    According to JF, the assailant told her that he had been sent by Al-Qaeda to steal her computer for the information it contained and that he would take other items to "make it look like a robbery." The man said he had an accomplice named "Habib" waiting outside and warned JF that Habib was "sex-crazy" and might rape and kill JF if he knew that she was in the apartment.

Repeatedly, the assailant threatened JF with a knife, placed the blade against her skin, and warned JF not to try to escape.

33. While threatening JF with the knife and warning her not to leave, the assailant left the apartment for brief periods of time, explaining that he needed to take the computer out of the apartment. At one point, the assailant purported to use the phone to carry on a conversation in a language that JF could not understand. However, JF believed the conversation to be fake, as she heard a "distinctive beeping noise" which indicated the phone was not actually in use. At trial, for the first time, JF asserted that she heard "two distinctive voices of conversation" and believed that a second person was in the apartment.

34. After some period of time, the assailant untied JF from the chair and put her on the bed. Explaining that he needed DNA samples, the man told JF to swab her cheek with a Q-tip, and he then inserted another into her vagina. The assailant tied JF to the bed and performed what he termed a "fake rape." This involved the man purporting to masturbate while "manipulat[ing] [JF's] fingers over [her] pubic area" and performing oral sex on her. Afterward, the man roughly wiped her stomach, groin, and legs with hand towels.

35. In addition to blindfolding JF, the assailant covered a mirror in her bedroom with a blanket, presumably to prevent her from identifying him. The assailant terrorized JF for more than two hours and convinced her that Al-Qaeda had bugged her phone and had been observing her movements. He made her

11

believe that her life, and that of her parents, were at risk if she spoke to the police.

36.     Eventually, the man told JF that he would leave. He untied her hands and told her to wait ten minutes before leaving her apartment. Terrified, JF did as instructed. When JF was finally able to free herself, she saw that the time was 2:40 p.m. JF noticed that the man had stolen a number of things, including a dark blue suitcase, CDs, her computer, some floppy disks, and jewelry.

37.     Convinced that Al-Qaeda had her phone bugged, JF called her aunt and arranged to meet her parents in Macon, Georgia – halfway between Thunderbolt, Georgia and their home in Auburn, Alabama. JF hurriedly grabbed a few things and left her apartment.

38.     No report of the home invasion and sexual assault committed at JF's apartment was made on the day of the crimes – Sunday, November 18, 2001.

### Initial Thunderbolt PD Investigation of the JF Home Invasion Leads Conners to Correctly Focus on Flint as the Prime Suspect

39.     On Monday, November 19, 2001, Thunderbolt PD was first notified of the crimes committed against JF the day prior. JF's parents made the report in-person at Thunderbolt PD and met with both O'Dwyer and Conners.

40.     Conners completed a cursory two-page Preliminary Investigation report which listed JF's father as the complainant. The Preliminary Investigation report contains no description of the assailant. Neither Conners nor any other Thunderbolt PD officer went to the crime scene on November 19, 2001.

41.     According to trial testimony, Conners spoke with JF on November 19, 2001. No record of this interview exists in what was subsequently produced as the Thunderbolt PD investigative file. Conners made arrangements with JF to meet with her in-person, but not until the following week.

42.     In a statement she prepared in the days after the attack, JF described her assailant as follows:

> He had dark skin, and looked to be of Hispanic or Middle Eastern descent. He had black hair, a mustache and no beard. His mustache and eyebrows were kind of bushy. His face was rugged looking, not smooth.

43.     The initial investigation led Connors and the Thunderbolt PD to the correct suspect – Sterling Flint. In fact, much of the evidence against Flint was uncovered because of information provided by Sonny (i.e., the report to law enforcement of Flint's possession of a stolen motorcycle, kept at Dold's house).

44.     The burglary and sexual assault of JF on November 18, 2001, were the most heinous, but not the only, criminal offenses committed by Sterling Flint that week.  Late the next day, Flint absconded with Sonny's Chevy Tahoe after first agreeing to help Sonny return the vehicle to Sonny's home in Atlanta.

45.     In an effort to recover his Tahoe, Sonny called Flint's mother and told her that Sonny would report the vehicle as stolen if Flint did not return it. Flint ignored his phone calls, so Sonny filed a stolen vehicle report with Clayton County PD. After learning Sonny had called his mother, Flint threatened to kill Sonny and his parents. Sonny thus lodged a report against Flint for making terroristic threats.

46.    During his reports to law enforcement officials regarding Flint's theft of his vehicle and threats to him and his family, Sonny provided investigators with Flint's phone number as well as that of Flint's girlfriend and mother.[6] Sonny also provided the address of Flint's girlfriend, Ashleigh Dold, and reported that law enforcement would find a stolen motorcycle at Dold's house.[7]

47.    Conners recovered JF's belongings at the home of Flint's girlfriend, Ashleigh Dold, on November 28, 2001. Significantly, law enforcement officers were prompted to visit Dold's home because of these reports *made by Sonny*.[8] Specifically, Sonny, while informing law enforcement of Flint's theft of his Tahoe and the threats against him and his family, had also reported that Flint kept a stolen motorcycle at Dold's home.

48.    Unbeknownst to Sonny, Flint used Sonny's Tahoe to commit daytime burglaries in Atlanta in the days after he stole it. Flint was ultimately arrested in Atlanta and charged in Cobb County for two of these crimes – the McLeroy and Zitsch burglaries. In both instances, homeowners came home while Flint was

---

[6]  The information conveyed by Sonny to law enforcement officers – (i) the addresses and telephone numbers for Flint, Flint's girlfriend, and Flint's mother; (ii) the fact that Flint had stolen Sonny's Chevy Tahoe; and (iii) the fact that Flint stored a stolen motorcycle at Dold's house – was all confirmed to be verifiably accurate.

[7]  During one phone call Sonny made to Flint, trying to persuade him to return the Tahoe, he asked Flint why he even needed the Tahoe since Sonny had seen Flint riding a motorcycle a day earlier. Flint responded by telling Sonny that the motorcycle was stolen.

[8]  This information is contained in the only other investigative report created by Thunderbolt PD – which is dated December 3, 2001 – four days *after* Sonny's arrest.

burglarizing their homes during the day. Flint was positively identified by photo arrays, his use of Sonny's Tahoe (e.g., identified by McLeroy and Zitsch), and a fingerprint of Flint's that was on property stolen from Zitsch.

49.    On November 28, 2001, based on the information that Sonny had provided, Savannah PD officers recovered the stolen motorcycle from Dold's residence. They contacted Conners about other items at Dold's residence, which matched the description of items stolen from JF. Upon arriving at Dold's residence, Conners confirmed that the items there belonged to JF.

50.    Conners interviewed Dold on November 28, 2001. Whatever notes or reports that Conners created in connection with his interview of Dold were either lost or destroyed, as none have been produced in subsequent discovery or located at any point thereafter. Conners's report and interview notes related to his interview of Dold would have been exculpatory as to Sonny.

51.    Dold, a former Chatham County deputy, handwrote a two-page statement on a Thunderbolt PD form in which she conveyed the following critical facts:

> (1) Dold had driven to Atlanta on November 14, 2001, to retrieve Flint, a motorcycle, a U-Haul trailer, and some of Flint's clothes and personal belongings;

> (2) Sonny and his girlfriend arrived in Savannah on the evening of Monday, November 19, 2001, after retrieving Sonny's Tahoe in Beaufort, South Carolina;

(3) Flint had Dold retrieve a computer from the U-Haul and take it to her house; and

(4) the U-Haul was parked at Dold's sister's house, which was located at 2516 Mechanics Avenue in Thunderbolt, Georgia.

52.    At this point in the investigation, it was clear that Flint was the perpetrator of the JF assault and burglary. As of November 28, 2001, Conners possessed the following information implicating Flint as the man who sexually assaulted JF and burglarized her apartment:

- JF's belongings – including her computer, a work-related floppy disk unquestionably linked to JF, and her blue suitcase – were stored amidst Flint's own personal belongings at the home of his girlfriend.

- Dold reported that she moved the computer, contained within JF's blue suitcase, from the U-Haul into her home at Flint's direction.

- The U-Haul from which Dold retrieved the computer and suitcase was the same one that she and Flint had towed from Atlanta to Savannah behind her vehicle, an Isuzu Amigo.[9]

- The U-Haul, unquestionably tied only to Flint, was parked at the home of Dold's sister, just a short walk from JF's apartment.

- Flint had a pair of blue and white batting gloves, which matched the description that JF provided, among his belongings at Dold's house. Dold identified the batting gloves as belonging to Flint.

- Tire tools, consistent with the type of break-in tools used to gain entry to JF's apartment, were in Flint's backpack at his girlfriend's house.

- Criminal records available to Conners revealed the following: Flint had a long criminal history, and regularly committed daytime

---

[9] There is no indication that Dold knew that the items Flint brought to her home were stolen. To the contrary, the available evidence indicates that she cooperated fully with law enforcement investigations once she learned of the crimes committed by Flint.

burglaries and used tire tools to gain entry into residences, and had previously used a stolen U-Haul trailer to store items he pilfered.

- Flint had use of Dold's vehicle and no one to account for his whereabouts for more than six hours after he dropped Dold off at work at approximately 12:00 p.m. on Sunday, November 18, 2001.

- Flint had longstanding ties to the Savannah area. In addition to having a girlfriend who lived in Savannah, Flint had also lived there and attended Savannah State University. He also had prior connections to Thunderbolt, and familiarity with the apartment complex where JF lived.

- Flint and Dold were smokers, a significant fact because JF noted: "I remember him smelling vaguely of body odor and smoke, as if he'd been around a smoker or something." Sonny did not smoke.

- Flint, an African-American, matched the description JF had given of a man with dark skin, black hair, mustache, no beard and bushy eyebrows.

53. The home of Dold's sister, at 2516 Mechanics Avenue in Thunderbolt, was around the corner from the River Crossing Apartments, such that one could walk between the two locations in a few minutes. Flint parked the U-Haul at that location and placed items stolen from JF's apartment in that U-Haul.[10]

54. The Google Maps image pasted below demonstrates how close the U-Haul was to JF's apartment complex.

---

[10] During post-conviction proceedings, Dold testified that the River Crossing Apartments were "25 to 30 feet" from the back door of her sister's house. (Habeas H'rg. Tran. p. 181.) Savannah State University, where Flint attended classes when he lived in Savannah, is situated between Dold's home and her sister's home.



55.    Not surprisingly, Conners considered Flint to be a likely suspect with respect to the criminal offenses against JF. He thus arranged for JF to view a photo array, including Flint, on the afternoon of November 28, 2001. This array was prepared by Savannah PD and displayed Flint <u>and five other Black males</u>.

56.    As depicted immediately below, JF picked Flint and one other Black male as resembling her attacker.



18

57.     The fact that JF picked another man, in addition to Flint, presented a problem for Conners. Any criminal case against Flint would be subject to a challenge to the identification as weak since another man besides Flint was also identified as resembling the assailant. Instead of seeking to bolster the case against Flint through other readily available investigatory steps, Conners chose to manufacture a case against Sonny and use Flint as a witness against him.

### Sonny Bharadia is Falsely Arrested and Indicted Following a Sham Identification Procedure and Fabrication of Evidence

58.     Aside from his incarceration, Sonny has been a long-time resident of the greater Atlanta area, and his family has longstanding roots in Atlanta.  On Sunday, November 18, 2001 – the day of the attack on JF – Sonny was in Atlanta for the entirety of the day.

59.     The night prior, Sonny had attended the new Harry Potter movie with a girlfriend, her daughter, and the children of another mutual friend. Throughout the day of November 18, 2001, Sonny was with other people, in and around Atlanta. His activities and whereabouts were all verifiable through witnesses who were with him in Atlanta at the time.

60.     Sonny also spoke with an officer of the Beaufort County Sheriff's Department about his Tahoe, which was at the Department's impound lot. The Tahoe had been recovered after a friend borrowed it and left it in Beaufort. Sonny did not want to press charges; he only sought to recover his vehicle. The impound

lot was closed on Sundays, so the Tahoe remained under the custody of the Sheriff's Department through the November 17-18, 2001, weekend. Sonny made arrangements to retrieve the vehicle on Monday, November 19, 2001.

61.    On Monday, November 19, 2001, Sonny left Atlanta for Beaufort with another girlfriend, Racquel Edwards, in her car. Because Edwards had a suspended license, Sonny asked Flint – whom he had met three months earlier and knew split time between Atlanta and Savannah – to drive his Tahoe back to Atlanta while Sonny drove Edwards's car.  These facts were corroborated by Dold, who reported that Sonny and Edwards arrived in Savannah on Monday, November 19, 2001, and that she and Flint had gone to dinner in Savannah with them that same night.

62.    After dinner, Flint, Sonny, and Edwards left for Atlanta – Sonny driving himself and Edwards in Edwards's car and Flint driving Sonny's Tahoe. It was on the return trip to Atlanta, very late on the night of November 19, 2001, that Flint veered off the highway on the outskirts of Atlanta and absconded with Sonny's Tahoe.

63.    Thus, Conners first heard Sonny's name from Dold on November 28, 2001, but only regarding Sonny's efforts to get his Tahoe back to Atlanta. Dold made clear that it was Flint – *her boyfriend* – who had brought the motorcycle and

U-Haul trailer to Savannah prior to this and that Flint was responsible for the presence of JF's stolen items in Dold's house.[11]

64.     Following the muddled identification of Flint on November 28, 2001, however, and due to prejudice against Sonny, whom Conners would later falsely label an "Islamic terrorist," Conners set about manufacturing a criminal case against Sonny. Because no actual evidence linked Sonny to the crimes committed against JF, Conners had to fabricate evidence to be used against him.

65.     Conners did so by arranging an unduly suggestive photo array. He compiled and/or directed the compilation of an array that guaranteed JF would (falsely and innocently) identify Sonny as her assailant.

66.     The photo array was laughably bad – literally. O'Dwyer, then Chief of Thunderbolt PD, and Sonny's defense attorney, Caleb Banks, laughed about the absurdity of the array when Banks viewed the photo array with O'Dwyer at Thunderbolt PD.

67.     Banks would later testify that Sonny's photo "jumps off the page at you." The other five men in the array were of a different race than Sonny, whose parents were both Indian. One of the photos was of a man with one eye. The photo of Sonny was the only one that was not "blurry." No effort was made to assemble

---

[11] In his Supplemental Report, Conners lied about Dold's statement. Conners claimed that Sonny's Tahoe was used to move the stolen U-Haul trailer to the location near JF's apartment. In reality, Dold said she and Flint moved the stolen U-Haul to that location using her Isuzu Amigo. Sonny's Tahoe was in the impound lot in Beaufort, SC on November 18, 2001.

a fair or legitimate array. Instead, Conners specifically intended for the array to lead JF to falsely identify Sonny as her attacker.

68. Conners used a dated photo of Sonny, taken in 1996, which depicts him with an entirely different look than he had in 2001. In the 1996 photo used in the array, Sonny has close-cropped hair and a prominent mustache. Sonny's booking photo, taken shortly after his November 30, 2001, arrest shows his appearance as it was at the time of the crimes against JF – with longer hair and no mustache. The 1996 photo used in the photo array, and Sonny's 2001 booking photo are pasted below, together with a photo of Flint from 2001.



| Sandeep Bharadia | Sterling Flint | Sandeep Bharadia |
|:---:|:---:|:---:|
| 1996 | 2001 | 2001 |

69. The circumstances surrounding the array featuring Sonny smack of bad faith. There exists no documentation of how the array was presented to JF, but it was Conners who oversaw the charade of an identification process and

presented the array. It was not presented to JF by someone who was disinterested and unaware of the true target of the identification procedure.

70.    Most tellingly, the photo array went missing prior to trial. No copy was made. The photo array was never provided to the DA's Office and, thus, the DA's Office could not honor its *Brady* and pre-trial discovery obligations and share a copy of the photo array with Sonny's defense attorney.

71.    The photo array was, at all times, under the exclusive custody and control of Thunderbolt PD. No explanation as to what became of the array has ever been offered, suggesting that Defendants O'Dwyer and Conners, in bad faith and with ill intent, either destroyed the photo array or otherwise caused its permanent disappearance.

72.    Based solely upon the sham identification Conners orchestrated and his lies about Dold's statement, Conners secured an arrest warrant for Sonny and caused his false arrest to be effected on November 30, 2001. Sonny was arrested, pursuant to this warrant, the same day in Atlanta.

73.    No legitimate evidence suggested Sonny committed the criminal offenses against JF.  No probable cause existed to justify Conners seeking an arrest warrant against Sonny, and the only way that he was able to ascertain such a warrant was through the presentation of fabricated and/or false information.

74.    In pursuing Sonny's false arrest, Conners willfully ignored readily available evidence indicating that Flint was the actual perpetrator, and also

willingly ignored readily available evidence demonstrating the impossibility that Sonny was the perpetrator.

75.     Subsequently, the Chatham County Grand Jury issued an Indictment on March 26, 2003, charging Sonny with aggravated sodomy, aggravated sexual assault, burglary, and theft by receiving. The Thunderbolt PD investigative file does not suggest that any additional information to be used against Sonny was obtained in the interim between Sonny's November 30, 2001, arrest and presentment to the Grand Jury and, thus, it is presumed that the same false and fabricated evidence was presented to the Grand Jury.

76.     No probable cause existed to justify seeking an Indictment against Sonny. The "case" against Sonny consisted of nothing beyond a sham identification and fabricated statements offered by Conners purporting to implicate Sonny in the theft of items from JF's apartment.

### Thunderbolt PD Willfully Disregarded Basic Investigatory Steps, as well as Evidence Supporting Flint's Guilt and Sonny's Innocence

77.     Throughout the investigation, Thunderbolt PD displayed a shocking level of incompetence. Both Thunderbolt PD officials involved – Chief O'Dwyer and Detective Conners – resigned their positions in law enforcement in disgrace. The State of Georgia Police Officer Standards and Training Council ("POST") stripped both men of their peace officer certifications.

78.    Neither Conners nor O'Dwyer were qualified to conduct a competent criminal investigation, particularly one with the import of the crimes against JF – which could (and did) result in the imposition of a sentence of life in prison.

79.    Though Conners worked as the lead detective on the case, Chief O'Dwyer served as Conners's supervisor and also assisted with the investigation. At every turn, O'Dwyer and Conners failed to take the most routine investigatory steps. They also willfully ignored the substantial evidence implicating Flint in the crimes against JF, as well as the substantial evidence proving that Sonny did not have (and could not have had) any involvement in those crimes.

80.    Those investigatory failures included the following:

- The crime scene was not timely secured nor documented. Thunderbolt PD officers first visited JF's apartment on November 26, 2001 – eight days after the assault and burglary. No sketch of the crime scene was made. Photos were taken but not dated or otherwise memorialized.

- The crime scene was not properly processed. Items identified by JF as handled by the assailant (e.g., pen, pencil, tape dispenser) were not collected as evidence. No attempt to recover trace evidence, such as hairs or fibers, was undertaken despite the fact that the assailant partially disrobed and was in JF's apartment for over two hours.

- Items identified as belonging to JF which were found at Dold's home were handled without gloves. Conners and O'Dwyer made no attempt to recover latent lifts from those items.

- No attempt was made to recover latent lifts from the motorcycle and the U-Haul, efforts which would have demonstrated the presence of Flint's fingerprints and the complete absence of Sonny's prints.

- None of JF's neighbors were interviewed. No attempt to canvass the neighborhood encompassing JF's apartment and the home of Dold's sister (where Flint parked the U-Haul) was made. Likewise, none of Dold's neighbors were interviewed.

- No attempt was made to verify the accuracy of Sonny's account of his movements and whereabouts over the November 17-18, 2001, weekend.

- Conners and O'Dwyer failed to investigate Flint's motive for falsely identifying Sonny as involved in the burglary. Specifically, Sonny had reported Flint to law enforcement for theft of his Tahoe and the threats against him and his parents, and Flint was unquestionably involved in the crimes against JF.

- Conners and O'Dwyer failed to assess Flint's long criminal history when determining whether to credit his statements given his use of more than a half dozen aliases, dates of birth, and Social Security numbers.

- Conners and O'Dwyer undertook no investigation to determine whether the tire tools contained within Flint's backpack at Dold's house were from Dold's vehicle, which Flint had exclusive use of during the afternoon of Sunday, November 18, 2001.

81. Meanwhile, the information Conners and O'Dwyer *did* discover in no way implicated Sonny – who was in Atlanta all day on Sunday, November 18, 2001, which Conners knew and had the means, opportunity, and obligation to verify.

82. At trial, Conners testified that the only evidence linking Sonny to the items stolen from JF's apartment was the statement he obtained from Dold. That statement, however, shows: (1) that Sonny was not even in the Savannah area until the evening of Monday, November 19, 2001; and (2) the items belonging to JF that

were found at the Dold house were placed there by Flint or at his direction; and

(3)  that Dold and Flint moved the U-Haul trailer by themselves.

83.    Quite simply, Conners fabricated both the claim that Sonny moved the U-Haul and the claim that Dold provided Conners with that information.[12] The criminal case against Sonny was based entirely upon a sham identification orchestrated by Conners and fabricated testimony to be offered by Flint and Conners.

84.    Exacerbating their fabrication of evidence inculpating Sonny, Defendants Town of Thunderbolt, O'Dwyer and Conners also caused the destruction or permanent loss of *Brady* evidence exculpating Sonny. This deprived Sonny's counsel of the ability to confront and expose the fabricated evidence.

## The Town of Thunderbolt Allowed its Police Department to be Operated by Unqualified Officers and in Contravention of Prevailing Standards

85.    As detailed above, Thunderbolt PD officials O'Dwyer and Conners recklessly conducted a woefully deficient investigation of the crimes involving JF. Their actions directly resulted in an innocent man serving 23 years in prison for

---

[12]   At trial, Conners was asked about the color of Sonny's "truck" that was supposedly involved in moving the U-Haul. He responded as follows: "I also learned that Mr. Bharadia's truck was used to load [JF's] stolen computer. At that point, that put me on to Mr. Bharadia." (Tr. Tran. p. 125.) When asked a follow-up question, Conners stated that it was "[a] blue truck." (Tr. Tran. p. 126.). The actual evidence of record is that Sonny's 1999 Chevy Tahoe was a type of silvery gold color, which Sonny referred to as "champagne-colored." Further, Dold has consistently denied telling Conners anything other than what is set forth in her handwritten statement and sworn testimony: Flint moved the U-Haul and JF's belongings and Dold also moved some of JF's property on Flint's direction.

crimes with which he had no involvement nor knowledge. Those same actions allowed the actual perpetrator of the heinous sexual assault against JF, Sterling Flint, to escape any meaningful punishment. Flint went on to commit numerous other criminal offenses while Sonny languished in prison.

86.     The Town of Thunderbolt never should have allowed O'Dwyer and Conners to work as criminal investigators. Because of prior misdeeds involving dishonesty and subornation of perjury, O'Dwyer was not even eligible to serve as a law enforcement officer when the Town hired him to be Chief of Police.

87.     At the time he served as the lead investigator in the JF case, Conners had minimal experience as a police officer. According to his POST training records, the only investigative training he had received during his police career was three hours of Sex Crime Investigations training on January 6, 1995.

88.     For his part, O'Dwyer had completed three training courses related to crime scene investigation – all more than a decade prior to his investigation of the JF case: (i) Crime Scene Processing, on June 5, 1984; (ii) Crime Scene Technician, on June 15, 1984; and (iii) Crime Scene Techniques, on December 21, 1989.

89.     Conners left Thunderbolt PD on May 20, 2002, and started work with Savannah PD on May 30, 2002. On August 19, 2003, Conners resigned his position

with Savannah PD, under pressure, and "in lieu of termination."[13] Georgia POST revoked Conners's peace officer certification on July 22, 2004.

90.    O'Dwyer resigned from Thunderbolt PD on July 31, 2002, under pressure and "in lieu of termination." According to an Administrative Law Judge's Decision and POST documentation, O'Dwyer and his partner on a narcotics squad instructed a confidential informant ("CI") to lie to a grand jury about their searching him prior to and immediately after drug buys. The CI was so troubled by the actions of O'Dwyer and his partner that the CI informed the GBI that the officers "now want me to lie for them before the grand jury." O'Dwyer agreed to surrender his POST peace officer certification in an effort to curtail a pending criminal investigation for perjury and subornation of perjury.

91.    O'Dwyer secured the position of Chief of Police with the Town by concealing those events and circumventing the agreement to surrender his POST certification. The ALJ concluded that O'Dwyer made "misleading, deceptive, untrue, or fraudulent misrepresentations," engaged in "unprofessional, unethical, [and] deceptive conduct" and committed acts "indicative of bad moral character or untrustworthiness." Georgia POST revoked O'Dwyer's peace officer certification on August 10, 2002.

---

[13]   Conners was arrested on June 8, 2003, in an incident in which he "punched [his] spouse in the face several times." According to POST documentation, he refused to let his spouse leave the residence. She escaped through a bedroom window to reach a neighbor's house and call for help.

92.     The Town of Thunderbolt was on notice of the serious and pervasive issues with Thunderbolt PD, yet no corrective action was undertaken.

93.     Conners noted some of those issues in his May 19, 2002, resignation letter addressed to the Thunderbolt Town Administrator. Conners wrote:

> In a profession where training, standards and Police discipline are foremost requirements, the lack of Integrity and severe mismanagement that dominates the Thunderbolt Police Department has precipitated my resignation.

94.     Quite simply, the Town of Thunderbolt and Thunderbolt PD, as of the time of Sonny's false arrest and unjust conviction, had no one on staff competent to properly investigate a felony sexual assault and burglary case. Instead of requesting the assistance of the GBI or another agency with superior knowledge and training, O'Dwyer and Conners chose to muddle through the investigation of the case involving JF. The results were tragic.

95.     The actual perpetrator of the heinous sexual assault was allowed a plea deal which required him to serve only three years in prison. Once released from prison, Flint continued to commit crimes and terrorize more Georgia citizens. Justice was not served with respect to the victim – JF's assailant escaped any real consequences for the harms he inflicted upon her. Additionally, Sonny lost 23 years of his life, languishing in prison while continuously (and truthfully) proclaiming his innocence.

96.    In addition to a lack of training with respect to criminal investigations, the Town of Thunderbolt and Thunderbolt PD completely shirked their obligations to properly maintain and safekeep evidence and records of criminal investigations.

97.    Conners noticed the issues with the Property Room at Thunderbolt PD and alerted Chief O'Dwyer. In a January 23, 2001, letter to O'Dwyer regarding "MISSING CASE FILE AND EVIDENCE RECORDS," Conners wrote:

> THE CASE FILE AND EVIDENCE PHOTOS FOR CRN 0101 0087—BATTERY (FVA) AND CHILD CRUELTY ARE MISSING FROM THE RECORDS OFFICE. THIS INCLUDES ALL ORIGINAL A&B'S ARRAIGNMENT FORMS, ORIGINAL REPORT, SUPPLEMENTALS AND EVIDENCE PHOTO'S [sic]. … I WOULD LIKE YOUR ASSISTANCE IN FINDING THE MISSING FILE; IT GOES WITHOUT SAYING THAT SUCCESSFUL PROSECUTION OF THIS OR ANY CASE IS SOLELY BASED ON DOCUMENTATION AND EVIDENCE.

98.    A month later, O'Dwyer appointed Conners to act as Thunderbolt PD's Evidence Custodian, despite Conners's lack of training or qualifications to serve in that role. The serious and pervasive issues with disorganization of the Thunderbolt PD Property Room persisted and worsened with Conners in charge.

99.    Items of evidence were simply placed in a supply closet with no proper chain of custody documentation and no identifying information on them. As such, it was exceedingly difficult to ascertain what evidence was collected in connection with a given criminal case. A search for evidence would need be undertaken manually by sifting through all items in the Property Room.

100.    William Buttersworth was hired by Thunderbolt PD in 2003 as an Investigator and Property Room Custodian. During post-conviction proceedings, he described the Property Room that he took over as "a nightmare" with many items contained therein with no case number or other identifying information to tie those items to any particular case.

101.    Requests for the Thunderbolt PD investigative file related to the JF assault and home invasion yielded varying responses through the years. No explanation was ever offered for those discrepancies. Likewise, neither the Town of Thunderbolt nor any official with Thunderbolt PD has ever explained when or how certain documents or materials which were reported to be part of the investigative file for the JF case were destroyed or "went missing."

102.    The following items were destroyed by Conners and O'Dwyer or otherwise "went missing" while under the custody of those officers and Thunderbolt PD:

- The photo array in which Sonny was prominently displayed, which O'Dwyer retrieved from a locked desk drawer, was destroyed or permanently "lost" after defense counsel Caleb Banks viewed it with Chief O'Dwyer. The array was never provided to the DA's Office and has not been seen since O'Dwyer showed it to Banks at the Thunderbolt PD offices.

- The photo array which included Flint was missing as of the time of trial and thus was not provided to the DA's Office and defense counsel prior to trial. A copy of this array was obtained during the post-conviction years with no explanation for why Conners, O'Dwyer and Thunderbolt PD were unable or unwilling to comply with their

pre-trial disclosure obligations and provide the array to the DA's Office and to defense counsel.

- A copy of the Flint photo array was produced by Thunderbolt PD in 2012. Prior thereto, the Town and Thunderbolt PD failed to produce the array even when ordered to do so by the trial court during post-conviction proceedings.

- The Thunderbolt PD file contains no *Miranda* waiver form for Sonny, though Conners testified (falsely) that he interviewed him "numerous times." (2005 EMNT, June 16, 2005, Tran. p. 7.)[14] There exist no notes or reports related to any interview of Sonny, and it is believed that Conners destroyed that documentation because Sonny's truthful statements conflicted with the fabricated narrative that Conners intended to present.

- In response to Open Records Act Requests ("ORARs"), the Town and Thunderbolt PD have asserted that they have no documents or materials related to the case. Moreover, the evidence list for Thunderbolt PD is irreconcilable with chain of custody documentation provided by the GBI.

103. The Town and Thunderbolt PD, for years, disregarded their obligations with respect to maintenance and safekeeping of items of evidence and records related to criminal investigations. Those failures contributed to the fundamental unfairness of Sonny's trial and also hindered the efforts of those working to prove his innocence and overturn his wrongful conviction.

---

[14]  In truth, Conners interviewed Sonny on *one* occasion – immediately following the Preliminary Hearing. Sonny's initial attorney, Mike Schiavone, was present for that interview which lasted approximately 45 minutes.

## Sonny Bharadia Was Subjected to An Unfair Trial Due to Defendants' Constitutional Violations

104.    After his November 30, 2001, arrest in Atlanta, Sonny was transferred to Chatham County. Mike Schiavone was appointed to represent him.

105.    Schiavone appeared with Sonny at the Preliminary Hearing. Immediately afterward, Conners sought an interview of Sonny. Though Schiavone ordinarily did not consent to having his clients interviewed by investigators, he was so convinced of Sonny's innocence and the strength of his alibi that Schiavone agreed. Schiavone told Conners that he could interview Sonny right then.

106.    Conners led Sonny and Schiavone to an office where the interview would take place. No one was present for the interview other than Conners, Sonny, and Schiavone. Conners checked both a video recorder and a tape recording device to ensure that both were working.[15]

107.    After turning on both the audio and video recorders, Conners interviewed Sonny. The interview lasted approximately 45 minutes. Both Sonny and Schiavone trusted Conners's representations that the interview would be recorded. Sonny detailed his activities in the Atlanta area on November 18, 2001,

---

[15]  In his trial testimony, Conners answered in the affirmative when asked whether his interview of Sonny was recorded, and testified that it was recorded on both audio and video tape. (Tr. Tran. p. 135.) Conners admitted that he had not put the tapes "into evidence" and did not know where the tapes were. (*Id.*) During post-conviction proceedings, Conners again testified that he recorded the interview of Sonny: "It was audio/video at the same time by the same camera in my office. My office was wired for that particular camera to record audio as well as the video portion." (2005 EMNT, June 16, 2005, Tran. p. 7.)

and explained that he had only come to Savannah on the evening of Monday, November 19, 2001, after retrieving his Tahoe from the Beaufort County (SC) Sheriff's Department. He provided details regarding who he had seen and where he had been during the weekend of November 17-18, 2001, as well as the next week. Sonny explained that Flint had stolen his Tahoe, refused to return it, and then used it to commit burglaries in the Atlanta area.[16]

108.    In the spring of 2002, Sonny retained Caleb Banks to represent him. On June 20, 2002, Banks filed a Consolidated Motion for Discovery, in which Banks sought disclosure of *Brady* materials. Banks also moved for the preservation of all investigatory notes and reports, as well as all audio and video recordings. The State thereafter filed its "Discovery Disclosures."

109.    Neither the audio nor the video recording of the interview were provided to the DA's Office or to Sonny's defense attorney. Just as with the photo arrays, the interview recordings would have constituted powerful evidence for Sonny's defense. The interview documented Sonny's contemporaneous account of his whereabouts on the November 17-18, 2001 weekend. In the absence of the recordings, Conners was free to lie about what was said, and Conners did so.

---

[16]    Cobb County PD Detective Ron Underwood relayed the same information regarding Flint's use of Sonny's Tahoe to commit burglaries in the Atlanta area to Conners. Likewise, Conners was informed that Sonny had lodged criminal complaints against Flint for theft and making terroristic threats.

110. No explanation for the "loss" of the audio and video tapes was ever provided. The unexplained disappearance of the tapes, combined with the similar disappearance of other exculpatory evidence, supports the inference that Conners and O'Dwyer destroyed the audio and video tapes in bad faith and with ill intent.

111. At trial, Conners was asked about the tapes. He lied and stated that they should be in the Thunderbolt PD investigative file.[17] At the time Conners offered this false testimony, he knew the tapes were not in the investigative file. Conners knew that the tapes were unattainable because they had been destroyed.

112. Prior to trial, both photo arrays – the one in which JF picked Flint and another man on November 28, 2001, and the one in which Sonny was so prominently displayed – went "missing." Neither photo array was provided by the State in discovery, and neither was available to Sonny's defense attorney (Banks) at the time of trial. The photo arrays constituted exculpatory *Brady* material, and Conners and O'Dwyer were duty-bound to provide the arrays to the DA's Office so that they could be, in turn, provided to Banks.

113. A copy of the Flint photo array surfaced during post-conviction proceedings, but the one featuring Sonny has never been produced. No explanation for its "loss" has ever been provided and, thus, Plaintiff believes that

---

[17] The record demonstrates that Conners offered false testimony at Sonny's trial. He was also the moving force behind the lies told by Flint. Undersigned counsel recognize that a claim based upon false testimony is not cognizable and wish to make clear that no claims asserted in this action are premised upon the false testimony offered or procured by Conners.

this photo array, which constituted exculpatory *Brady* evidence was destroyed in bad faith by either Conners or O'Dwyer, or by the two of them acting in concert.

114.    The Thunderbolt PD investigative file for the JF case consists of a two-page Preliminary Investigation Report dated November 19, 2001, and a single-page Supplemental Report dated December 3, 2001. The only witness statement contained in the investigative file, aside from JF's 10-page typed statement, is Ashleigh Dold's two-page statement of November 28, 2001. Substantial additional investigatory notes and reports existed at one point but were not disclosed by Thunderbolt PD investigators to the DA's Office and, accordingly, were not provided to Sonny's defense counsel. These materials, which constituted *Brady* evidence, included the following:

- Investigatory notes and reports regarding the initial conversation between JF, O'Dwyer, and Conners from November 19, 2001.

- Investigatory notes and reports related to Conners's conversations with and interview of Flint.

- Investigatory notes, reports, and correspondence related to Conners's efforts to obtain a DNA sample from Flint.

- Investigator notes related to Conners's interactions with Det. Ron Underwood of Cobb County PD about Flint's theft of Sonny's Tahoe and use of that vehicle in a series of burglaries. Underwood documented communications with Conners in his reports. But the Thunderbolt PD investigative file is devoid of any records created by Conners about communications with Underwood or any other law enforcement in the Atlanta area.

- Investigator notes related to Conners's interactions with Savannah PD on November 28, 2001, which dialogue prompted Conners's trip to Dold's house on that day.

- Investigatory notes and report related to Conners's interview of Ashleigh Dold on November 28, 2001.

115.    The fact that additional materials were created and, at one time, existed is established by Conners's testimony during post-conviction proceedings. Asked about the investigative file, Conners unequivocally testified as follows: "Yes, I did, a very lengthy one." (2005 EMNT, June 16, 2005, Tr. pp. 11-12.)

116.    As the criminal case against Sonny proceeded toward trial, the DA's Office failed to provide Sonny's defense attorney, Caleb Banks, the exculpatory *Brady* materials referenced herein. The DA's Office for Chatham County adhered to a policy of "open file" discovery during the relevant time period. If the Thunderbolt PD investigators had complied with their pre-trial discovery obligations, the critical *Brady* evidence at issue would have been timely provided to Sonny's defense attorney.

## II.    SONNY BHARADIA IS UNJUSTLY CONVICTED.

### Defendants Conners and O'Dwyer Conceal Exculpatory Evidence and Cause Fabricated Evidence to be Used at Trial

117.    The criminal case against Sonny was called for trial on June 26, 2003.

118.    Defense counsel, Caleb Banks, had filed pre-trial motions to ensure that the DA's Office provided full discovery, including all materials required to be disclosed pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963).

119.    Because Conners and O'Dwyer knew that the DA's Office and the responsible Assistant District Attorney ("ADA") Nancy Grey Smith would comply with their obligations under *Brady* and its progeny, they withheld from the prosecution team substantial exculpatory evidence that was critical to Sonny receiving a fair trial.

120.    The DA's Office made pre-trial disclosures on June 5, 2023, and June 16, 2023. The photo arrays were not included within the State's discovery production. Additionally, investigator notes and reports which would have included critical exculpatory information were not produced.

121.    Banks had seen the photo array which featured Sonny and was present when O'Dwyer laughed about its absurdity. Banks planned to base his defense at trial on the photo arrays:

- The first photo array included six Black males. **This array was exculpatory as to Sonny for two primary reasons: (i) all persons pictured were Black, and Sonny, who is of Indian descent, is obviously *not* Black; and (ii) one of the individuals who JF picked from this array was Sterling Flint – the actual perpetrator.**

- The second photo array was arranged in such a way to ensure that JF picked Sonny, as Conners intended. **This array was exculpatory as to Sonny in that it was laughably suggestive, with all photos other than the one of Sonny being blurred and showing men of a different race such that Sonny's photo "jumps off the page at you."**

122.   As Banks would later testify during post-conviction proceedings, the photo arrays were unquestionably exculpatory as to Sonny.[18] When Banks realized that the photo arrays were not included in the State's discovery, he inquired about them with ADA Smith, who told Banks that she and the DA's Office had not received the photo arrays from Thunderbolt PD investigators (identified as Conners and O'Dwyer).

123.   The audio and video tapes of Conners's interview of Sonny were not provided to the DA's Office or to Banks. The tapes constituted powerful *Brady* evidence in that the police interview of Sonny confirmed the impossibility of his involvement in the crime. Banks was hindered in his defense at trial because he was denied critical evidence with which he could have impeached Conners's honesty and the integrity of the investigation.

124.   At trial, Conners was asked about the basis for his assertion that Sonny's vehicle was used to transport goods stolen from JF's apartment. Conners testified as follows:

> In my interview with your client, he also told me about Sterling loading computers and stuff in his truck. (Tr. Tran. p. 134.)

---

[18]   Banks attested as follows: "I recognized that the photo array was highly suggestive. Mr. Bharadia was prominently displayed in the array. His photo was the only one that was not blurry. Also, one of the other photos depicted a man with one eye, and the other photos all depicted men of a different race than Mr. Bharadia." (Banks Aff., ¶ 6.) Banks, as detailed further below, testified similarly at both postconviction hearings at which he provided live testimony.

That was a lie. Sonny never stated that his Tahoe was used to transport items stolen from JF. It was not.

125.    Because Defendants Conners and O'Dwyer failed to preserve the interview tapes, Banks was prevented from directly proving that Sonny had never made such a statement and that Conners's testimony on that point was a blatant, knowing falsehood.

126.    Conners was one of six witnesses for the State. He testified falsely on several other critical points. Because Conners and O'Dwyer failed to disclose to the DA's Office materials subject to *Brady*, Banks was prevented both from exposing Conners's false testimony and from undermining the integrity of the investigation.

127.    Conners testified falsely on the following critical points:

- He replied, "No, sir" when asked: "Did you take or attempt to take DNA samples from Sterling Flint?" (Tr. Tran. p. 139.)

  **Documents produced by Thunderbolt PD during postconviction proceedings included a fax sent by Conners, reading: "Atwell, Per our discussion on Sterling Flint. Pending charges: (1) Burglary (2) Kidnapping. Search warrant for his blood has been secured for DNA testing. Pls. advise me A.S.A.P. on his extradition status. Thank you, Det. Conners"**

  Documentation that Conners sought the DNA of an alternative suspect would have been important, exculpatory material that would have made a difference in presentation of the defense case.

- He replied, "No, sir" when asked: "Other than the information from Ms. Dold, did you get any other information from any source, civilian, police or otherwise concerning Mr. Bharadia?" (Tr. Tran. p. 139.)

**Documents uncovered during postconviction proceedings included a report from Cobb Co. PD Detective Underwood in which he noted: "The possible stolen motorcycle information was turned over to Detective Conners of the Thunderbolt Police Department. All information on suspects: Bharadia and Flint was shared with Detective Conners."[19]**

- Conners testified: "I also learned that Mr. Bharadia's truck was used to load [JF's] stolen computer. At that point, that put me on to Mr. Bharadia." (Tr. Tran. p. 125.)

  **This is a fabrication. No one told Conners that Sonny's "truck" was used to transport any of JF's items.**

- Conners, referring to his interview of Sonny, testified: "[Bharadia] also told me about Sterling loading computers and stuff in his truck." (Tr. Tran. p. 134.)

  **This is a fabrication. Neither Sonny nor anyone else told Conners any such thing.**

- Asked about the whereabouts of the Flint photo array, Conners stated: "It would be in the investigator file." (Tr. Tran. p. 140.)

  **This is a fabrication. Conners knew that neither array was contained within the Thunderbolt PD investigative file. He knew that both had been destroyed or permanently lost.**

- When asked if he remembered the second photo array, Conners replied: "No, sir, not specifically." (Tr. Tran. p. 141.) He did, however, assert that the array was made by the "Savannah Police Department forensics lab." (Tr. Tran. pp. 139, 140.)

---

[19] Preparation of Det. Underwood's typed Supplemental Report postdated Sonny's arrest. Thus, it appears that his reference to Sonny as a "suspect" is based entirely on Conners's report to Underwood on November 30, 2001, that "both Bharadia and Flint have been developed as suspects in his jurisdiction in reference to a home invasion kidnapping, etc." All substantive information in the Cobb Co. PD documentation relates to Flint's use of Sonny's vehicle during the McLeroy and Zitsch burglaries, as well as Sonny's police reports against Flint regarding the latter's theft of the Tahoe and making terroristic threats against Sonny and his family.

**All available facts and inferences indicate that, contrary to Conners's testimony, he compiled the photo array in which Sonny was featured.**

128.    Defendants also directly caused fabricated evidence to be used against Sonny at trial that included the following: (i) JF's purported identification of Sonny, which Conners and O'Dwyer knew to have been procured through a sham photo array; (ii) the false narrative that Ashleigh Dold reported that Sonny's "truck" was used to move the U-Haul; (iii) the false narratives that Sonny had acknowledged, during police interviews, moving the U-Haul and using his vehicle to move JF's belongings; (vi) the false narrative that Sonny was the only individual from whom Conners sought a DNA sample; and (vii) the false narrative that Sonny had spoken with Conners "several times," thereby bolstering the officer's credibility and the supposed accuracy of the narratives he created.

129.    All of the acts of misconduct in the preceding paragraphs, which acts were committed by Conners and O'Dwyer in bad faith, served to deprive Sonny of fair criminal proceedings to which he was entitled.

### Sonny is Convicted and Sentenced to Life in Prison

130.    The case against Sonny was tried on June 26-27, 2003. The prosecution theory of a crime was premised entirely on the false and fabricated evidence presented to the DA's Office by Conners and O'Dwyer. The only "evidence" of guilt introduced as against Sonny consisted of: (i) JF's mistaken identification of Sonny as the assailant, which identification Conners orchestrated in bad faith; (ii)

Flint's false testimony implicating Sonny, which narrative Conners's and O'Dwyer's actions allowed to take root; and (iii) Conners's own false narratives and false testimony.

131. If defense counsel had been provided the exculpatory and impeachment evidence to which they were entitled under *Brady*, Sonny would have been acquitted. Absent the fabrication of evidence by Defendants Conners and O'Dwyer, there would not have been a criminal case against Sonny. By causing the destruction or permanent loss of exculpatory evidence, Conners and O'Dwyer deprived Sonny's counsel of material needed to mount an effective defense and thereby caused his wrongful conviction.

132. The trial court directed verdict as to the theft by receiving charge, based on the State's case, premised on the narrative propagated by Conners and O'Dwyer, that Sonny burglarized JF's apartment with Flint or possibly someone else. After only 73 minutes of deliberation, the jury convicted Sonny of the remaining counts – aggravated sodomy, aggravated sexual offense, and burglary. He was sentenced to life in prison without the possibility of parole.

## III.    EFFORTS TO PROVE SONNY BHARADIA'S INNOCENCE ARE REPEATEDLY THWARTED.

### Requests for and Order to Preserve Evidence

133. An experienced criminal defense attorney, Steve Sparger, was appointed to represent Sonny with respect to a motion for new trial and direct

appeal. One of Sparger's first actions on behalf of Sonny was to move for an Order to Preserve Evidence.

134.    The trial court issued its Order to Preserve Evidence ("Preservation Order") on December 1, 2003. The Order required Thunderbolt PD to preserve all records and evidence obtained by it and its investigators in connection with the underlying case.

135.    The Preservation Order also required Thunderbolt PD to produce a written inventory of all evidence held by it. Sparger delivered a copy of the Order to then-Chief of Police Steve Smith, on December 2, 2003, along with a cover letter which noted the following:

> During the investigation, or at least prior to the trial of the above-styled matter, a number of different objects which were contemplated as being evidence, were lost, misplaced or destroyed.

136.    The investigative file ultimately produced by Thunderbolt PD differed materially from the file that Conners and O'Dwyer produced to the DA's Office in advance of Sonny's trial. Numerous items, however, including the photo arrays and interview tapes remained missing and unaccounted for.

137.    The file produced by Thunderbolt PD in response to the Preservation Order included the sole Property and Evidence Form prepared by the agency in connection with the case. The Property and Evidence Form is dated March 26, 2003, some 16 months after evidence was collected. The most basic police and

evidence maintenance standard procedures require contemporaneous preparation of property and evidence documentation in criminal investigations.

138.   One critical fact revealed in the version of the investigative file produced by Thunderbolt PD in response to the December 1, 2003, Preservation Order was that Conners *had* sought DNA from Flint during the investigation. A note that Conners handwrote in follow-up to a conversation about a search warrant to obtain a sample of Flint's blood "for DNA testing" was included in this version of the investigative file.

**Sonny's Direct Appeal and Initial Motion for New Trial**

139.   Contemporaneous with his review of Sonny's case, Sparger met Aimee Maxwell, the Executive Director of the Georgia Innocence Project ("GIP"). As of 2003, GIP was the only organization in Georgia that regularly used DNA testing in criminal cases. GIP lawyers and staff, at its Atlanta headquarters, would ultimately assist Sonny in his exoneration efforts from 2003 through 2024.

140.   At the time, Maxwell recommended that Sparger contact Forensic Science Associates ("FSA"), a lab in California run by Dr. Edward Blake. FSA was one of the most advanced labs in the country and had a reputation for being able to find useable DNA where others could not.

141.   Sparger contacted Dr. Blake, who advised him to send all available pieces of evidence to the lab. Through a series of ex parte in-chambers conferences with the trial judge, Sparger secured court approval for FSA to conduct DNA

analysis of the case evidence. Sparger made arrangements to send the evidence, along with a reference blood sample from Sonny, to FSA.

142.    In 2004, FSA was one of the only labs in the country that performed a new type of DNA analysis known as "Touch DNA," which focused on the transfer of epithelial cells from a person to an object. The GBI Crime Lab did not begin performing Touch DNA analysis until the 2009-2010 timeframe and, even then, would only authorize such analysis under certain prescribed circumstances. As late as 2011, the GBI placed "'Contact' or 'Touch' DNA" in the category of "Last Resort Testing."

143.    On November 16, 2004, FSA issued its report. FSA identified a female DNA profile from epithelial skin cells recovered from a Diet Coke can from JF's kitchen, which JF thought might have been one from which the assailant drank. The FSA report indicated that the contributor of the female DNA on that can, dubbed "Unknown Female #1," was likely JF given that the same DNA profile was found on the batting gloves worn by the perpetrator.

144.    FSA identified an unknown male DNA profile on the batting gloves, which it dubbed "Unknown Male #1." This Unknown Male #1 was identified as a likely contributor at every single location on the gloves where a male DNA profile was detected. Significantly, **Sonny was categorically eliminated as a possible contributor of the male DNA at** *every location.*

145.    FSA recommended that reference samples be obtained from JF and Flint to confirm whether those individuals were Unknown Female #1 and Unknown Male #1, respectively. With this critical new evidence, Sparger went back to the trial court, which held another in-chambers conference, this time with an ADA present. The ADA stipulated that Unknown Female #1 was likely JF. The State, however, opposed the request to obtain a reference sample from Flint.

146.    The trial court denied Sparger's request for DNA reference samples to be obtained from Flint and JF.

147.    Sparger also consulted with Dr. Steven Cole, an expert in eyewitness identification. Dr. Cole identified several factors which would cast doubt on the accuracy of JF's purported identification of Sonny as her assailant, including:

Opportunity to Observe: One of the most difficult kinds of eyewitness identification is that of a stranger when the encounter is brief, with fast-moving events.
Forgetting Curve: Humans forget details very rapidly after an event, and continue forgetting as time passes, with the forgetting becoming more and more gradual with time.

Cross-Racial Identification: People are less accurate at identifying a member of another race than they are at identifying members of their own race.

Stress and Violence: Contrary to popular conception, a person's accuracy in remembering a face decreases with the violence, anxiety, and stress that accompany the situation in which the face was originally seen.

Eyewitness Confidence: Contrary to popular conception, an eyewitness's confidence is not a good predictor of his or her identification accuracy.

148.   Dr. Cole also described an empirical lineup study that he could conduct to test the fairness of the photo array in which Sonny was featured. Sparger had made repeated requests of Thunderbolt PD regarding the photo array and any other records or evidence from the underlying case. The Town and Thunderbolt PD, though, remained unwilling or unable to produce the photo array and other responsive materials, thereby hindering Sparger's efforts to prove Sonny's innocence and the wrongfulness of his convictions.[20]

149.   Because the Town and Thunderbolt PD failed to produce evidence, records, and materials which they should have been able to make available, Sparger was forced to proceed without such evidence. Sparger pressed ahead with the Motion for New Trial based upon the reports of FSA and Dr. Cole.

150.   Sparger had filed the Motion for New Trial, to preserve Sonny's appellate rights, on July 23, 2003. He filed an Amended Motion for New Trial on November 25, 2003, and a second Amended Motion for New Trial on March 21, 2005. The hearing of that Motion took place on May 16, 2005, June 16, 2005, and August 4, 2005.[21]

---

[20]   As of the time of Sparger's work on the Motion for New Trial, all eight of the DNA exoneration cases in Georgia involved mistaken eyewitness identification. Nationally, 70-75% of DNA exonerations have occurred in cases in which mistaken eyewitness testimony contributed to a wrongful conviction.

[21]   Two separate Extraordinary Motions for New Trial were litigated in this matter. They are referred to herein as 2005 EMNT and 2012 EMNT, consistent with the years in which the respective evidentiary hearings were conducted.

151.    At the hearing, Thunderbolt PD Detective Bill Buttersworth testified that the Thunderbolt PD Property Room was disorganized and that recordkeeping was incomplete. He was only able to locate what remained of the investigative file by conducting a manual "search, piece by piece." (2005 EMNT, May 16, 2005, Tran. p. 13.) There were no records as to where case evidence and materials might be found in the Property Room at Thunderbolt PD. (*Id.*)

152.    Conners testified that all of his case paperwork, including photo arrays, records, reports, notes, warrants, and criminal histories would be kept in his investigative file when he worked at Thunderbolt PD. (2005 EMNT, June 16, 2005, Tran. pp. 5-9, 13.) He acknowledged that the photo arrays and his "very lengthy" investigative report were no longer in the investigative file for the case. (*Id.* at pp. 11-12.)

153.    When he was asked about the Thunderbolt PD Property Room, Conners stated that TPD did not actually have a Property Room, but instead just "a closet they kept stuff in." (*Id.* at p. 16.) Conners denied that anyone was in charge of the Property Room, and instead identified the responsible individual as "whoever the investigator is at that time." (*Id.* at p. 16.) Conners's testimony on that point is contradicted by O'Dwyer's February 23, 2001, memo *appointing Conners as the TPD Evidence Custodian*.

154.    In questioning on June 16, 2005, Conners acknowledged that he was involved in assembling the photo array in which Sonny was featured. (2005

EMNT, June 16, 2005, Tran. pp. 10-11.) ("I do know that there was pictures of Mr. Bharadia that were made available to us.") Conners admitted to obtaining a photo of Sonny from the Georgia Department of Corrections database, and to corresponding with another law enforcement agency regarding Sonny. (*Id.*)

155.    Conners, though, again testified falsely during the 2005 EMNT proceedings. Asserting that he recognized that using a dated photograph of Sonny might be misleading, Conners claimed that he contacted Sonny's family and had them send a recent photo of Sonny to be used in the array. He testified as follows on that subject:

> But as I recall my – my fear was that that was an older photo and that he looked – might look different. So, what we did is we had the family just send a more recent photo of Mr. Bharadia, and I believe that's what was placed in the photo lineup.

(2005 EMNT, June 16, 2005, Tran. p. 11.)

156.    That assertion was patently untrue. The photo that Conners used in the array was taken some time in or near 1996, at Rogers State Prison.[22] Both Banks and Sonny recognized that Conners used an old photo in the array. That same 1996 photo of Sonny was used in a December 6, 2001, *SavannahNow* news article, in which Conners is quoted at length on the arrests of Sonny and Flint.

---

[22]    Sonny was previously convicted for his involvement in a "chop shop" operation. He pled guilty to those offenses because he was guilty. Sonny served his time, and resolved to never again be on the wrong side of the law. As evidence of his good faith attempts in that regard, Sonny spoke with his parole officer and obtained a travel permit in order to retrieve his Tahoe from Beaufort, South Carolina, on November 19, 2001.

157.    While Conners admitted that the older photo he obtained was one in which Sonny "looked … [] different" than he did as of November 2001, that is the photo that Conners used in the photo array. The assertion that he and O'Dwyer obtained "a more recent photo" from Sonny's family was a blatant falsehood.

158.    During his June 2005 testimony, Conners had the opportunity and obligation to explain what became of the photo array used to procure a mistaken identification from JF. Conners continued to conceal the truth about the investigation and the whereabouts of critical evidence and documents, thereby obstructing efforts to prove Sonny's innocence. Conners again repeated the false statement that he interviewed Sonny "numerous times." (2005 EMNT, June 16, 2005, Tran. p. 7.) ("I interviewed [Mr. Bharadia] numerous times.")

159.    The trial court, in an Order filed on September 20, 2005, denied the Motion for New Trial. That ruling, and Sonny's conviction, was affirmed by the Georgia Court of Appeals in an Opinion issued on November 27, 2006. *Bharadia v. State of Georgia*, 282 Ga. App. 556, 639 S.E.2d 545 (2006) (*Bharadia I*). On February 26, 2006, the Supreme Court of Georgia denied certiorari.

## Second Extraordinary Motion for New Trial ("2012 EMNT")

160.    In 2011, GIP joined the efforts by Sparger to prove Sonny's innocence and the wrongfulness of his convictions.

161.    Efforts by GIP to obtain missing evidence and records from the underlying case continued. Numerous ORARs were sent to Thunderbolt PD and

any other agency that might have any information about Flint and the Thunderbolt PD investigation.

162.    On September 6, 2011, GIP and Sparger filed an Extraordinary Motion for New Trial ("EMNT") and a Motion for DNA Testing. At this point, a sample of Flint's DNA was contained within CODIS. Thus, there was no longer a need to obtain a reference sample from Flint. A simple "keyboard search" with CODIS would suffice. The team working on behalf of Sonny requested that the male DNA profile from the batting gloves worn by JF's assailant be used in a CODIS search.

163.    A hearing was conducted on April 17, 2012. The next day, the trial court granted the request to submit the male DNA profile into CODIS.

164.    On April 26, 2012, the GBI issued a report confirming that, as expected, it was Flint's DNA on the batting gloves. Sterling Flint was proven to be Unknown Male #1, the individual who wore the batting gloves during the sexual assault of JF.

165.    Another evidentiary hearing was conducted on September 28, 2012. In advance of this hearing, Thunderbolt PD finally produced a copy of the photo array in which Flint was pictured. No explanation was provided as to why Thunderbolt PD produced a copy of this array in 2012 but not pre-trial or in response to earlier requests.

166.    Thunderbolt PD had not produced the copy of the Flint array in response to the December 1, 2003, Preservation Order. Nor had Thunderbolt PD produced the copy of the array in response to earlier requests and ORARs.

167.    Despite the CODIS match to Flint, the trial court denied the 2012 EMNT in an Order dated January 11, 2013. In summary, the court reasoned that DNA testing of the gloves could have been undertaken prior to trial and thus was not "new evidence" for purposes of obtaining post-conviction relief. This ruling was incorrect. Touch DNA analysis was <u>not</u> available at the time of Sonny's trial in June 2003.

168.    GIP and Sparger appealed the denial of the EMNT. The Court of Appeals of Georgia, largely adopting the trial court's erroneous reasoning, affirmed the denial of the EMNT in an Opinion issued on March 10, 2014. *Bharadia v. State of Georgia,* 326 Ga. App. 827, 755 S.E.2d 273 (2014) (*Bharadia II*). The Court of Appeals denied a Motion for Reconsideration on April 7, 2014. After a grant of certiorari, the Supreme Court of Georgia, in an Opinion issued on June 29, 2015, affirmed the denial of the EMNT. *Bharadia v. State of Georgia,* 297 Ga. 567, 774 S.E.3d 90 (2015) (*Bharadia III*).

## Petition for Writ of Habeas Corpus

169.    On March 28, 2011, private counsel Holly A. Pierson, assisting Sonny on a pro bono basis, filed a Petition for Writ of Habeas Corpus. Pierson worked on the Habeas Petition in conjunction with GIP and Sparger. Additionally, a talented

group of attorneys from the Atlanta office of the prestigious, international law firm of Eversheds Sutherland (US) LLP joined the effort.

170.    The Town and Thunderbolt PD remained unable or unwilling to produce critical evidence, such as the investigative file, the photo array featuring Sonny, and the audio and video tapes of Conners's interview of Sonny in the presence of Mike Schiavone. A *Miranda* waiver form has never been produced despite Conners's claim that he interviewed Sonny "numerous times." Notes and reports related to interviews of Ashleigh Dold and Sterling Flint, and notes related to Conners's interactions with Clayton County PD and Savannah PD have never been produced.

171.    An Amended Petition for Writ of Habeas Corpus and Brief in Support was filed on December 30, 2022.

## IV.    SONNY BHARADIA IS EXONERATED.

172.    A hearing on the Amended Habeas Petition was conducted on June 23, 2023, before Judge Laura Tate of Gwinnett County Superior Court.

173.    Evidence was introduced regarding ORARs sent to Thunderbolt PD in 2012, 2017, 2019, and February 2024. None yielded the photo array featuring Sonny, the recordings of Conners's interview of Sonny, or the investigative file. James Sebestyen, Manager of the GBI's Forensic Biology Section, addressed the availability of Touch DNA analysis and testified that the GBI began working with that technology in the 2009-2010 timeframe.

174.    At the hearing, Banks again testified about how absurdly suggestive the photo array featuring Sonny was. Banks provided unequivocal testimony that the photo array constituted exculpatory evidence. (Habeas H'rg., Tran. pp. 76-77, 82, 103.) ("[Bharadia] sort of just jumped off the page at you."; "If you saw the two together, it was completely exculpatory. Again, at trial [Bharadia] looks nothing like Sterling Flint. You cannot, you cannot confuse them.")

175.    The Habeas hearing brought to light two facts which were hidden from the DA's Office and Banks pre-trial, which facts, if disclosed, would have allowed Banks to show that Conners testified falsely at trial. First, Banks was not provided information about Conners seeking a DNA sample from Flint. (Habeas H'rg., Tran. p. 79.) Next, Banks was not provided information about Conners receiving information about Sonny from anyone other than Ashleigh Dold. (*Id*. at p. 143.) Disclosure of available documentation on these points pre-trial would have allowed Banks to both undermine the integrity of the Thunderbolt PD investigation and to show that Conners was untruthful.[23]

176.    Additionally, Banks addressed the personal animus that he observed Conners having against Sonny:

> He [Conners] was, he was not the non-involved police officer. He was very much involved in this case. I guess, for whatever reason. And when I say

---

[23]    Documents uncovered during post-conviction proceedings show that: (i) Conners did make a request to obtain a DNA sample from Flint, implying that Conners knew Flint was likely the perpetrator, and (ii) Cobb County Detective Ron Underwood contacted Conners and told him that Sonny had reported Flint for stealing Sonny's vehicle, thus providing Flint with even more of an incentive to falsely implicate Sonny in Flint's crimes.

involved, I think he was personally involved in the case. He personally, not as a police officer, he personally wanted to put the hat on Mr. Bharadia, not on Sterling Flint.

(Habeas H'rg., Tran. pp. 94-95.)

177.    Ashleigh Dold Brown testified that she never told Conners that Sonny or his vehicle was involved in moving JF's belongings, further proving that Conners not only testified falsely at Sonny's trial but also committed a separate *Brady* violation in concealing the initial Dold statement to him about the complete lack of any connection between Sonny and the items stolen from JF's apartment. (Habeas H'rg., Tran. pp. 182-85; Brown Aff., ¶¶ 5-9.)

178.    On April 9, 2024, the Final Order and Judgment Granting Writ of Habeas Corpus was entered in Gwinnett County Superior Court. Though the Order was grounded on a claim of ineffective assistance of counsel ("IAC"), that IAC claim was premised upon counsel not effectively elucidating the wrongful acts by Conners, O'Dwyer, and the Town of Thunderbolt which violated Sonny's constitutional rights and deprived him of a fair trial. Specifically, Judge Tate concluded that Thunderbolt PD investigators employed and then destroyed an "impermissibly suggestive" identification procedure, "presented false evidence," and "suppressed material, exculpatory evidence."

179.    On August 29, 2024, a Bond Order was issued, setting bond at $10,000. Sonny's mother, a longtime resident of Atlanta, posted her son's bond. Thereafter, Sonny was transferred to Tennessee, where charges related to a prison phone scam

were pending. A motion and order of nolle prosequi were filed as to those charges. That decision resulted in Sonny's release from custody on November 22, 2024. Sonny had been wrongfully incarcerated for 22 years and 51 weeks.

180.    On May 16, 2025, the Chatham County DA's Office moved for an Order of Nolle Prosequi as to the offenses committed against JF. Judge Bass, the same judge who sentenced Sonny to life without possibility of parole, entered the Order of Nolle Prosequi, resulting in the dismissal of criminal charges against Sonny. At that point, Sonny was finally removed from legal jeopardy with respect to the criminal charges wrongfully leveled against him on November 30, 2001.

## V.   SONNY BHARADIA SUFFERED MIGHTILY DURING HIS 23-YEAR WRONGFUL INCARCERATION.

181.    Sonny was just 27 years old when he was wrongfully arrested. He was 50 years old when finally released from custody. Sonny lost the entirety of his thirties and forties, languishing in prisons throughout Georgia. He has struggled to pick up the pieces of his life and to find his way forward. Sonny has encountered considerable difficulties navigating a changed world. The scars of a quarter century of incarceration will plague and haunt him for the rest of his life.

182.    For 23 years, Sonny Bharadia was denied his free will and the right to make a life of his own. He was told when to wake up, when to go to bed, when and what to eat, when to shower, and when he could exercise or enjoy fresh air.

183.    Sonny experienced significant emotional trauma as a result of his

wrongful incarceration and his separation from his beloved family. He was often housed at prisons far from family and went years without visits.

184.    Loved ones, including his father, passed away while Sonny was wrongfully incarcerated. Other family members became ill or died while Sonny suffered in prison. Sonny was denied the ability to help or to be with family, friends, and loved ones during their times of need.

185.    As a direct and proximate result of Defendants' violations of Sonny's civil and constitutional rights and obstruction of justice, Sonny was arrested, deprived of fair criminal proceedings, wrongfully convicted, and imprisoned for 23 years for crimes he did not commit.

186.    Sonny spent his 23 years of wrongful incarceration housed at various Georgia prisons, where his damages accrued. Specifically, Sonny was housed for:

- 10 years, 3.5 months – from February 2005 to September 2014 – at Hays State Prison, located in Chattooga County, Georgia;

- 5 years, 3.5 months – from January 2019 to May 2024 – at Phillips State Prison, located in Gwinnett County, Georgia;

- 3 years, 7 months – from September 2014 to April 2018 – at Valdosta State Prison, located in Lowndes County, Georgia;

- 2 years, 1.5 months – briefly in 2002, then from January 2003 to February 2005 – at Lee Arrendale State Prison, located in Habersham County, Georgia;

- 3 months, 19 days – from September 2002 to January 2003 – at Walker State Prison, located in Walker County, Georgia;

- 39 days – in April and May 2018 – at Georgia State Prison, located in Tattnall County, Georgia;

- 30 days – in August and September 2002 – in Baldwin state Prison, located in Baldwin County, Georgia.

187.    His life expectancy and the quality of life he can expect to experience during his remaining years have both been negatively impacted by his long-term incarceration in these facilities. For example, throughout his two-decade wrongful incarceration, in these prisons, Sonny was subjected to inadequate nutrition and medical care.

188.    The threat of random violence was a constant for Sonny during the 23 years he spent in some of Georgia's most dangerous prisons. Fights and attacks were common. Sonny suffered permanent physical injuries and emotional trauma as a result of physical assaults against him in prison.

189.    Sonny was attacked on July 16, 2016, at Valdosta State Prison. In that incident, another inmate struck Sonny in the head with a sock which contained a lock. Sonny suffered head trauma, a fracture of the right temporal bone, and hearing loss. To this day, Sonny experiences hearing difficulties as a result of that attack. A medical assessment on February 1, 2017, noted that Sonny suffered "right TMJ arthralgia likely secondary to skull fracture."

190.    Sonny was attacked and stabbed eleven times on November 19, 2018, while housed at Hays State Prison. He suffered severe lacerations to his scalp, neck and ear, which required sutures and staples for repair of same.

191.   Treatment for injuries Sonny suffered in the above-referenced July 2016, and November 2018, assaults continued for many months thereafter. Both attacks caused permanent injury. For months after those assaults, Sonny experienced intense pain while his injuries healed and were treated by prison medical staff. The emotional trauma resulting from those attacks continues to this day and have contributed to his Post-Traumatic Stress Disorder ("PTSD").

192.   Sonny was involved in numerous other random fights and attacks throughout his wrongful incarceration. He spent considerable time in isolation cells, sometimes arbitrarily subjected to prison discipline simply because he was the victim of an unprovoked attack.

193.   The tortuous efforts to secure his freedom even after DNA evidence proved his innocence caused severe mental health crises. Likewise, the death of his father in 2015 caused Sonny to question whether life was worth living if he was to remain separated from loved ones. Convinced that his situation was hopeless, Sonny attempted suicide while in prison. He contemplated suicide both frequently and for months on end during his two-decade ordeal.

194.   Sonny had an extremely difficult time in prison. Though now free, Sonny struggles with PTSD and continues to be burdened with the damage inflicted upon him and his family as a result of his wrongful incarceration.

195.   In summary, Sonny's past and ongoing injuries include but are not limited to: (a) humiliation, indignities, and embarrassment; (b) damage to

reputation; (c) damage to family relations; (d) inadequate medical and dental care; (e) poor nutrition; (f) physical pain and suffering; (g) severe emotional distress; (h) depression; (i) loss of employment, wages, and benefits; (j) diminished earning capacity; (k) restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, access to media and technology, travel, and the right to express oneself and to live a life of one's own choosing; and (l) such other injuries as may be shown by the evidence.

## COUNT I
**42 U.S.C. § 1983 Claim for Fourteenth Amendment Due Process Violations
Fabrication of False Inculpatory Evidence**
(Against Defendants Conners and O'Dwyer in their Individual Capacities)

196.    In the manner more fully described above at ¶¶ 8-12, 50-75, 82-84, 119-30, Defendants Conners and O'Dwyer, while acting in concert and aiding and abetting one another, deprived Sonny of his constitutional right to a fair trial and fair legal process by deliberately causing the fabrication of false inculpatory evidence.

197.    Defendants Conners and O'Dwyer acted jointly in agreement to deprive Sonny of his constitutional rights. Each engaged in overt acts in furtherance of that agreement and in furtherance of their intent to deprive Sonny of his constitutional rights by manufacturing false evidence, making false

representations to the DA's Office, and by failing to intervene to prevent others' misconduct.

198.    Defendants Conners and O'Dwyer deprived Sonny of his liberty without due process of law and of his right to a fair criminal proceeding by deliberately fabricating evidence that was used to wrongfully arrest, prosecute, convict, and imprison him for 23 years. These Defendants did so willfully and maliciously with full knowledge that no evidence whatsoever connected Sonny to the crimes committed against JF on November 18, 2001.

199.    Defendants Conners and O'Dwyer unlawfully fabricated evidence used to arrest, charge, prosecute, and wrongfully convict Sonny and deprived Sonny of fair criminal proceedings in the following respects:

(a) Conners procured a false identification of Sonny as JF's assailant through the use of an ID procedure that was a mere sham. The photo array included persons of a different race than Sonny and his photo was the only one that was not blurry. Presentation of the array was done so in a way to suggest to the victim that Sonny was "the one" that she was to select. The array used an old, dated photo of Sonny, in which he appeared with an entirely different look than he had as of the time of the offense. Namely, Sonny had longish hair and no mustache in November 2001; Conners used an old photo of Sonny in the array that showed Sonny with very short hair and a prominent mustache. Conners assembled the misleading, unduly suggestive photo array in which Sonny was singled out as "the one" to be selected. Both Conners and O'Dwyer were aware that the array would be used to prosecute Sonny.

(b) Defendant Conners fabricated false statements and false reports to be attributed to Sonny and Ashleigh Dold, which statements falsely implicated Sonny. Neither Sonny nor Dold said anything to indicate that Sonny was involved in the crimes against JF. These false

statements and false reports were used in the prosecution of Sonny with the knowledge, involvement, and assent of Defendants Conners and O'Dwyer.

(c) In other respects to be proved through discovery and at trial.

200. Sonny's prosecution was premised upon the above-referenced false inculpatory evidence that had been fabricated by Defendants Conners and O'Dwyer. That fabricated evidence directly led to Sonny's arrest, his indictment, his conviction, and his wrongful imprisonment for 23 years.

201. Any reasonable law enforcement officer in 2001 and 2003 would have known – and Defendants Conners and O'Dwyer did know – that the fabrication of evidence as alleged herein was unlawful.

202. The misconduct described herein was objectively unreasonable and was undertaken willfully, intentionally, and in reckless disregard for Sonny's clearly established constitutional rights.

203. Absent the fabrication of evidence by Defendants Conners and O'Dwyer, the arrest and prosecution of Sonny could not and would not have been pursued, and Sonny would not have been convicted.

204. All of the foregoing acts were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

205. Defendants' fabrication of false inculpatory evidence directly and proximately caused Sonny's wrongful arrest, conviction, and deprivation of

liberty without due process of law for 23 years, as well as the physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

206.    The acts of Defendants O'Dwyer and Conners, as alleged herein, were willful, wanton, intentional, in reckless disregard for and/or indifferent to the rights and safety of the public, including Sonny, who as a result spent 23 years in prison for crimes he did not commit.

207.    As a result of Sonny's wrongful conviction and imprisonment, Sonny sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages.

208.    Defendants are jointly and severally liable to Sonny for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein.

209.    For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

210.    Sonny is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## COUNT II
### 42 U.S.C. § 1983 Claim for Fourteenth Amendment Violations
### Concealment of Exculpatory and Impeachment Evidence
(Against Defendants Conners and O'Dwyer in their Individual Capacities)

211.   In the manner more fully described above at ¶¶ 12-13, 15, 50, 55-57, 70-71, 84, 102-03, 108-16, 118-31, Defendants Conners and O'Dwyer deliberately, intentionally, and in bad faith failed to disclose exculpatory and impeachment evidence to the DA's Office as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

212.   Defendants Conners and O'Dwyer deprived Sonny of his clearly established constitutional right to due process of law and fair criminal proceedings by deliberately, intentionally, and in bad faith failing to disclose exculpatory and impeachment evidence to the DA's Office, including the following:

(a) Defendants Conners and O'Dwyer failed to produce to the DA's Office either photo array used in the underlying investigation – the one in which JF picked the actual perpetrator (Sterling Flint) and one other Black man as resembling her assailant, and the unduly suggestive array in which Sonny was prominently displayed as "the one" that was to be selected.

(b) Defendants Conners and O'Dwyer concealed their notes and reports related to their initial interviews and conversations with JF in which she described her assailant in such a manner that Conners and O'Dwyer assembled a photo array featuring Flint (a Black male), and five other Black males.

(c) Defendants Conners and O'Dwyer concealed their notes and reports related to their initial interviews and conversations with Ashleigh Dold in which she provided information which was inculpatory with respect to Flint (the actual perpetrator) and exculpatory as to Sonny.

(d) Defendants Conners and O'Dwyer concealed the Thunderbolt PD investigative file which could only contain information exculpatory as to Sonny since he had no involvement in the subject crimes and was nowhere near Thunderbolt, Georgia at the time of their commission.

(e) Defendants Conners and O'Dwyer concealed the audio and video tapes of Conners's interview of Sonny which contained exculpatory and impeachment evidence subject to *Brady* disclosure requirements.

(f) Defendants Conners and O'Dwyer concealed records documenting that, contrary to Conners's trial testimony, Thunderbolt PD investigators Conners and O'Dwyer had sought Flint's DNA during the investigation.

(g) Defendants Conners and O'Dwyer concealed records documenting that, contrary to Conners's trial testimony, Thunderbolt PD investigators Conners and O'Dwyer had obtained information about Sonny and Flint from another source besides Ashleigh Dold, namely Detective Ron Underwood of Cobb County PD.

(h) In other respects to be proved through discovery and at trial.

213. These Defendants' failure to document and disclose exculpatory and impeachment evidence to the DA's Office was intentional and deliberate and done in bad faith. Defendants Conners and O'Dwyer were aware of the material exculpatory and impeachment value of the concealed information and evidence, as well as their obligation under *Brady* to disclose same and intentionally and in bad faith failed to do so.

214. Any reasonable law enforcement officer in 2001 and 2003 would have known, and these Defendants did know, that the exculpatory and impeachment evidence described in this Count had to be documented and disclosed to the DA's

Office. No reasonable officer would have believed that the misconduct described herein was lawful.

215.    Defendants' intentional, deliberate and bad faith failure to disclose exculpatory and impeachment evidence as described in this Count deprived Sonny of his right to a fair criminal process and his constitutional right to due process under the Fourteenth Amendment.

216.    Defendants' wrongful concealment of exculpatory and impeachment evidence directly and proximately caused Sonny's wrongful conviction and deprivation of liberty without due process of law during his 23-year wrongful incarceration, as well as the other injuries and damages set forth in this Complaint and to be proved through discovery and at trial.

217.    As a result of Sonny's wrongful conviction and imprisonment, Sonny sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages.

218.    Defendants are jointly and severally liable to Sonny for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein.

219.    For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

220.    Sonny is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

<u>COUNT III</u>
**42 U.S.C. § 1983 Claim for Fourteenth Amendment Violation**
**Bad Faith Destruction of Evidence**
(Against Defendants Conners and O'Dwyer in their Individual Capacities)

221.    In the manner more fully described at ¶¶ 13-15, 50, 70-71, 101-03, 109-16, 120-23, 134-37 above, Defendants Conners and O'Dwyer were in possession of critical evidence following Sonny's November 30, 2001, arrest. This evidence included both photo arrays used in the investigation, as well as the audio and video tapes of Conners's interview of Sonny. These materials, in particular, constituted *Brady* evidence that Defendants Conners and O'Dwyer were obligated to provide to the DA's Office, so that the materials could, in turn, be provided to Sonny's trial counsel.

222.    The evidentiary value of the photo arrays was apparent and obvious, as evidenced by the following:

- The first photo array consisted of photos of six Black males. Sonny is not Black. He is of Indian descent.

- In the initial photo array, the victim picked the actual perpetrator (Sterling Flint) first. She then picked another Black male as also resembling the perpetrator.

- The photo array which featured Sonny was constructed in a way that telegraphed to the victim that Sonny was "the one" that she should select.

- All other photos in the array that featured Sonny, besides his, were blurry.

- The photo array that included Sonny depicted five men of another race than Sonny.

- The array featuring Sonny was laughably bad, in that Sonny's photo "jumps off the page at you." Chief O'Dwyer recognized the absurdity of the array and laughed about it.

223.    The exculpatory nature of the two photo arrays was so clear that trial counsel, Caleb Banks, based the defense case on them. Banks was surprised when the photo arrays were not included in the Discovery Disclosures he received from the DA's Office. Banks inquired and was told that the DA's Office never received the photo arrays from Thunderbolt PD.

224.    When Banks viewed the photo arrays, he did so at the offices of Thunderbolt PD, where O'Dwyer had them in a locked desk.

225.    The evidentiary value of the audio and video recordings of Conners's interview of Sonny was likewise obvious and apparent. The tapes would have provided corroboration of Sonny's truthful, contemporaneous account of his activities and whereabouts on the November 17-18, 2001, weekend, and on Monday, November 19, 2001. The tapes also would have allowed Banks to undermine Conners's credibility and the integrity of the investigation, when Conners offered untruthful testimony at trial.

226.    The photo arrays and the tapes of Conners's interview of Sonny were last known to be under the custody and control of Conners, O'Dwyer, and

Thunderbolt PD. No explanation for the failure to provide these *Brady* materials to the DA's Office has ever been offered. No court order authorized the destruction of these materials and there is no record of their destruction, transmittal, or disposition.

227.    Defendants Conners and O'Dwyer either destroyed or caused the permanent "loss" of the subject photo arrays and the audio and video tapes because those items would have undermined the criminal case against Sonny which was concocted by these Defendants.

228.    These Defendants' intentional destruction of evidence was done in bad faith, with malice, and with knowledge of both the exculpatory and evidentiary value of the subject evidence. Their destruction of evidence was objectively unreasonable and was undertaken intentionally.

229.    Defendants Conners and O'Dwyer knew, or reasonably should have known, that the bad faith destruction of evidence was likely to lead to the conviction of Sonny, despite his actual innocence. These actions were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

230.    In destroying this exculpatory evidence, Defendants Conners and O'Dwyer not only deprived Sonny of evidence which would have prevented his wrongful conviction, they also greatly hindered his ability to prove his innocence through available post-conviction remedies.

231.    As a direct and proximate result of these Defendants' bad faith destruction of evidence, including but not limited to the photo arrays and the interview recordings, Sonny was deprived of his Fourteenth Amendment rights to a fair trial and due process of law. The misconduct alleged in this Count also hindered Sonny's ability to seek meaningful access to the courts during post-conviction proceedings and thereby also deprived him of rights guaranteed under the First Amendment.

232.    As a result of these Defendants' misconduct, Sonny was wrongfully convicted and subjected to 23 years of wrongful incarceration and suffered physical, emotional, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

233.    Defendants are jointly and severally liable to Sonny for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein.

234.    For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

235.    Sonny is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

<u>COUNT IV</u>
**42 U.S.C. § 1983 Claim for Fourth Amendment Violation**
**Malicious Prosecution**
(Against Defendants Conners and O'Dwyer in their Individual Capacities)

236.   In the manner more fully described above at ¶¶ 7-15, 50-76, 79-84, 119-30, 174-77, Defendants Conners and O'Dwyer, acting individually and in concert with each other, under color of state law and within the scope of their employment with the Town of Thunderbolt and Thunderbolt PD, caused, instituted, and participated in the initiation of a criminal proceeding against Sonny despite the absence of probable cause. Thereafter, Defendants Conners and O'Dwyer caused that criminal proceeding to be continued against Sonny up to and through the time of trial.

237.   Defendants Conners and O'Dwyer caused Sonny to be arrested and seized pursuant to an arrest warrant that was not supported by probable cause.

238.   The criminal proceedings described herein (e.g., Sonny's arrest, indictment, seizure, and trial) were instituted and continued by Defendants Conners and O'Dwyer with malice. The wrongful actions of these Defendants caused incomplete, misleading, and fabricated evidence and information to be provided to the DA's Office with knowledge that their actions would result in criminal proceedings being pursued against Sonny.

239.   As detailed above at ¶¶ 8-12, 50-75, 82-84, 119-30, all inculpatory evidence used to prosecute Sonny, i.e., a sham photo array identification and false

reports attributed to Sonny, Dold, and Conners, was fabricated. At all relevant times, Defendants Conners and O'Dwyer were aware that the actual evidence uncovered implicated Flint, and only Flint. Furthermore, Defendants Conners and O'Dwyer were aware of readily available evidence which would have proved the impossibility of any theory of a crime involving Sonny and consciously chose to ignore such evidence.

240.   Any preclusive effect that would ordinarily apply to a finding of probable cause by a magistrate, judge, or a grand jury is nullified by these Defendants' deliberate and bad faith actions that led to fabricated, false, incomplete, and misleading evidence being used to secure Sonny's arrest, seizure, and indictment.

241.   Sonny was seized on November 30, 2001, as a result of the initiation of the criminal proceedings, and he remained incarcerated pursuant to the wrongful criminal charges described herein up to and including November 22, 2024, when he was finally released from custody, following his DNA exoneration. Additionally, Sonny was not removed from the threat of legal jeopardy until entry of the May 16, 2025, Order of Nolle Prosequi.

242.   As a direct and foreseeable consequence of the misconduct described herein on the part of these Defendants, Sonny was unreasonably and unlawfully subjected to criminal prosecution and 23 years of wrongful incarceration.

243.    Defendants' malicious prosecution of Sonny caused his arrest, seizure, prosecution, and wrongful imprisonment for 23 years.

244.    As a direct and foreseeable consequence of Defendants' misconduct described in this Count, Sonny suffered physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

245.    Defendants are jointly and severally liable to Sonny for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein.

246.    For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

247.    Sonny is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

<u>**COUNT V**</u>
**42 U.S.C. § 1983 *Monell* Claim for Deprivation of Constitutional Rights**
**Policy, Practice & Custom Claim**
(Against Defendant Town of Thunderbolt)

248.    The Town of Thunderbolt, is liable for the violation of Sonny's constitutional rights because Sonny's injuries were caused by the policies, practices, and customs of the Town, as well as by the actions of the policy-making

officials for the Town, including but not limited to the Chief of Police of Thunderbolt PD.

249.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the Town failed to promulgate proper or adequate rules, regulations, policies, and procedures on: (i) the handling, preservation, and disclosure of exculpatory evidence; (ii) the writing of police reports and notes of witness statements; (iii) the conduct of photo lineups and identification procedures; (iv) maintenance, documentation, and safekeeping of records of investigations and evidence collected; and (v) maintenance of investigative files and disclosure of those files in criminal proceedings.

250.    Additionally, or in the alternative, the Town of Thunderbolt failed to train, supervise, or discipline officers with respect to the topics referenced in the preceding paragraph. The Town chose not to implement any or adequate policies and training in these areas even though the need for such policies and training was obvious, and the failure to do so would lead to violations of constitutional rights.

251.    Sonny expressly alleges that the need for training and supervision regarding the areas identified above was so obvious, that Defendant Town was on notice of both the lack of training and supervision and the fact that individuals' rights and safety were at near-certain risk of violation due to those widespread and persistent deficiencies. Defendant Town was deliberately indifferent to the

obvious need for proper training and supervision and the risks that would accompany the continued absence of proper training and supervision.

252.   The failure to promulgate proper or adequate rules, regulations, policies, procedures, and training was committed by final policymakers of the Town of Thunderbolt or those delegated final policymaking authority.

253.   At all times relevant herein, final policymakers for the Town of Thunderbolt, including the Town Council, Town Manager, Town Administrator, and Chief of Police, knew of these problems and allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

254.   The constitutional violations complained of by Sonny were a highly predictable consequence of a failure to equip Thunderbolt PD officers with the specific tools – including policies, training, and supervision – to handle the recurring situations of how to handle, preserve, and disclose exculpatory evidence; how to conduct proper identification procedures, including photo lineups; maintenance, documentation, and safekeeping of records of investigations and evidence collected; and how to write police reports and notes of witness statements.

255.   In addition, the misconduct described in this Count was undertaken pursuant to policies and practices of the Town in that the constitutional violations committed against Sonny were committed with the knowledge or approval of

persons with final policymaking authority for the Town of Thunderbolt or were actually committed by persons with final policymaking authority, such as the Thunderbolt PD Chief of Police including Defendant O'Dwyer, his predecessors and his successors, and the Town Administrator.

256.   The policies, practices, and customs set forth above were maintained and implemented with deliberate indifference. They were the moving force behind the constitutional violations described above and directly and proximately caused Sonny to suffer the grievous and permanent injuries and damages described in this Complaint and to be proved through discovery and at trial.

257.   In addition, Defendant O'Dwyer, as the Thunderbolt PD Chief of Police, ratified the actions of Conners in procuring a false identification of Sonny as JF's assailant through the use of a misleading, overly suggestive photo array in which Sonny was singled out as "the one" the be selected. As described herein, Conners assembled the sham photo array and presented it in a way to suggest to the victim that Sonny was "the one" that she was to select. Based on his involvement in the investigation, O'Dwyer knew that no evidence connected Sonny to the crimes committed against JF, and that Conners assembled the photo array so that Sonny would be selected. Such ratification provided tacit permission for such conduct to Conners and Thunderbolt PD officers.

258.   Prior to Sonny's indictment, O'Dwyer showed the sham photo array to defense counsel Caleb Banks at Thunderbolt PD. O'Dwyer recognized the

overly suggestive nature of the array and laughed about it during that meeting. O'Dwyer was aware that the array would be used to indict Sonny and prosecute him at trial. O'Dwyer fully ratified Conners's actions and the basis of those actions, making Defendant Town of Thunderbolt also liable to Sonny for the violation of his constitutional rights described above. Chief O'Dwyer's ratification of Conners's use of a sham photo array prior to Sonny's indictment and trial was the moving force behind the constitutional violations described above and directly and proximately caused Sonny to suffer the grievous and permanent injuries and damages described in this Complaint and to be proved through discovery and at trial.

259.    Defendants are jointly and severally liable to Sonny for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein.

260.    For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

261.    Sonny is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## COUNT VI
### 42 U.S.C. § 1983 Claim for First and Fourteenth Amendment Violations
### Denial of Meaningful Access to the Courts
(Against All Defendants)

262.    Defendants Conners, O'Dwyer, and the Town of Thunderbolt deprived Sonny of his constitutional right to due process of law and meaningful access to the courts by continuing to conceal evidence and records with which Sonny could have proved his innocence post-conviction and thereby secured his release from prison. Additionally, the Town of Thunderbolt maintained the Thunderbolt PD Property Room in such a haphazard and constitutionally deficient manner that the Town was unable to ascertain what evidence and records either were, or at one time were, under its custody and control.

263.    Following Sonny's wrongful conviction, Defendants continued to conceal their misconduct and deprived Sonny of evidence that would have allowed him to successfully challenge his conviction through post-conviction remedies that were available to him, including but not limited to an Extraordinary Motion for New Trial or a Petition for Writ of Habeas Corpus. Such efforts, based on evidence which Defendants concealed and/or destroyed, would have been successful and would have led to Sonny's exoneration and his earlier release from prison.

264.    Evidence and records which should have been kept and maintained by the Town of Thunderbolt and Thunderbolt PD were not properly kept and

maintained. Regular audits and inventories of the records and evidence facilities were not conducted. As a result, post-conviction requests for records and evidence from the underlying criminal case went unheeded and efforts to pursue meaningful post-conviction access to courts on Sonny's behalf were stymied.

265.    Due to Defendants Conners's and O'Dwyer's misconduct and continued concealment of exculpatory evidence, together with the Town's failure to see that proper records were kept, Sonny was denied access to evidence, and materials needed to file properly supported post-conviction motions or otherwise obtain meaningful access to the courts.

266.    Moreover, having placed Sonny in a position of peril and immediate continuing danger, Defendants were under a legal and constitutional duty to come forward with exculpatory evidence in their possession in each and every year following Sonny's conviction in 2003 through Sonny's exoneration in 2024.

267.    As a result of Defendants' acts and omissions, Sonny was deprived of evidence that would have allowed him to successfully challenge his conviction through post-conviction remedies that were available to him, under then-prevailing Georgia law. Efforts to attain post-conviction relief, based on evidence which Defendants failed to disclose, would have been successful and would have led to Sonny's exoneration and release from prison years earlier.

268.    Defendants' actions and omissions, collectively, foreseeably, directly and proximately deprived Sonny of his rights under the First and Fourteenth

Amendments by unlawfully interfering with his right of meaningful access to the courts and needlessly extended his wrongful incarceration. As a result of Defendants' misconduct, Sonny was wrongfully imprisoned for 23 years, and suffered physical, emotional, psychological, and pecuniary injuries as described in this Complaint and to be proved through discovery and at trial.

269.    Defendants are jointly and severally liable to Sonny for compensatory damages resulting from the violation of his civil rights, obstruction of justice, and wrongful conduct as described herein.

270.    For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

271.    Sonny is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

<u>COUNT VII</u>
**Intentional Infliction of Emotional Distress**
(Against Defendants Conners and O'Dwyer in their Individual Capacities)

272.    In the manner described more fully above at ¶¶ 7-15, 50-76, 79-84, 119-30, 174-77, Defendants Conners and O'Dwyer caused Sonny to be wrongfully arrested, seized, and prosecuted for crimes of which he was completely innocent. These Defendants' conduct was extreme and outrageous and exceeds all bounds usually tolerated by a decent society.

82

273.    The misconduct on the part of Defendants Conners and O'Dwyer was rooted in an abuse of power and authority and was undertaken with the intent to cause severe emotional distress to Sonny. In the alternative, the misconduct at issue was undertaken in reckless disregard of the probability that these Defendants' actions would cause Sonny to suffer severe emotional distress.

274.    The misconduct of Defendants Conners and O'Dwyer was undertaken intentionally and in deliberate disregard of a high probability that emotional distress would follow.

275.    In causing Sonny's false arrest and wrongful conviction, premised solely on false and fabricated evidence, Defendants Conners and O'Dwyer acted deliberately, willfully, in bad faith, and with malice.

276.    As a result of these Defendants' misconduct, Sonny suffered severe and debilitating emotional distress and damages to be proved through discovery and at trial.

277.    Sonny is also entitled to punitive damages in an amount sufficient to punish Defendants for their wrongful actions and to deter others from such misconduct in the future.

## COUNT VIII
### Malicious Prosecution
(Against Defendants Conners and O'Dwyer in their Individual Capacities)

278.    In the manner described more fully above at ¶¶ 7-15, 50-76, 79-84, 119-30, 174-77, Defendants Conners and O'Dwyer subjected Sonny to an unlawful prosecution without probable cause. They did so deliberately and with malice.

279.    Defendants Conners and O'Dwyer, both individually and jointly, as well as within the scope of their employment with Thunderbolt PD, accused Sonny of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Sonny without any probable cause for doing so and in spite of the fact that they knew Sonny was innocent.

280.    In doing so, Defendants Conners and O'Dwyer caused Sonny to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury to Sonny.

281.    Defendants Conners and O'Dwyer caused a criminal proceeding to be instituted against Sonny, which actions were undertaken deliberately, willfully and wantonly and with malice. No probable cause supported the criminal charges that were instituted against Sonny.

282.    Defendants Conners and O'Dwyer caused criminal proceedings to be brought against Sonny without probable cause and without any reasonable belief in guilt. Sonny was completely innocent of the crimes committed against JF. As

Defendants Conners and O'Dwyer knew, the sole basis for the criminal action against Sonny was the false and fabricated identification of Sonny that was orchestrated by Conners. Additionally, Defendants Conners and O'Dwyer knew that Sonny could not have been involved in the crimes against JF because Sonny was in the Atlanta area during the entirety of the November 17-18, 2001, weekend.

283. Following the DNA exoneration of Sonny, the criminal proceedings against Sonny were ultimately terminated in his favor with the May 16, 2025, Order granting the Motion for Nolle Prosequi.

284. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Sonny's clear innocence.

285. As a result of these Defendants' misconduct, Sonny was subjected to malicious prosecution under Georgia law, and suffered damages as alleged in this Complaint. Sonny is therefore entitled to recover damages as alleged herein and to be proved through discovery and at trial.

286. Sonny is also entitled to punitive damages in an amount sufficient to punish Defendants for their wrongful actions and to deter others from such misconduct in the future.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff respectfully prays for the following relief:

1.      Compensatory damages from all Defendants, jointly and severally, in an amount to be determined at trial.

2.      Punitive damages from the individual Defendants, jointly and severally, in an amount to be determined at trial, that will deter such conduct by Defendants and other officials and law enforcement officers in the future.

3.      Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988.

4.      Costs of court and interest as allowed by law.

5.      A trial by jury on all contested issues of fact.

6.      Such other and further relief as the Court may deem just and proper.

This the 17th day of November 2025.

**BARRON WARD LLC**
*Local Counsel for Plaintiff Sandeep "Sonny" Bharadia*

By:  */s/ Lynsey Morris Barron*
        Lynsey Morris Barron (GA Bar No. 661005)
        1800 Peachtree St NE, Suite 300
        Atlanta, Georgia 30309
        Telephone: (404) 857-2282
        lynsey@barronward.com

**OLSON LAW, PLLC**
*Attorney for Plaintiff Sandeep "Sonny" Bharadia*

By: */s/ G. Christopher Olson\**
    G. Christopher Olson (NC Bar No. 21223)
    514 Daniels Street, #136
    Raleigh, NC 27605
    Telephone: (919) 624-3718
    Facsimile: (919) 328-5355
    chris@olsonlaw-pllc.com

*\*attorney admission application forthcoming*

**EDWARDS BEIGHTOL**
*Attorneys for Plaintiff Sandeep "Sonny" Bharadia*

By: */s/ Nicholas Hartigan*
    Nicholas Hartigan (GA Bar No. 408147)
    njh@eblaw.com
    Catharine Edwards\* (NC Bar No. 52705)
    cee@eblaw.com
    Post Office Box 6759
    Raleigh, North Carolina 27628
    Telephone: (919) 636-5100

*\*attorney admission application forthcoming*